UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SEAN BAKER,

Petitioner,

- against -

PAUL PICCOLO, Superintendent, Southport Correctional Facility,

Respondent.

No. ______________

**PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

To the Honorable Judge of the United States District Court for the Southern District of New York:

Preliminary explanation: The allegations of this petition are in the form dictated by the Model Form for use in applications for habeas corpus under 28 U.S.C. § 2254 cases in the United States District Courts.

Paragraphs 1 through 8 state the history of the state court proceedings; paragraphs 10 through 35 state the federal constitutional claims; paragraphs 36 through 37 contain required technical information.

## PROCEDURAL HISTORY

1. The name and location of the court which entered the judgment of conviction and sentence under attack is: Supreme Court of the State of New York, Bronx County.

2. The date of the judgment of conviction is April 20, 2010.

3. Sean Baker is imprisoned pursuant to a sentence of a term of 20 years to life.

4. Mr. Baker is currently incarcerated at Southport Correctional Facility, Pine City, New York, under the custody of respondent, Paul Piccolo, the Superintendent of Southport Correctional Facility. Mr. Baker's prison number is 10-A-3405.

5. The nature of the offenses involved is that Mr. Baker was convicted of murder in the second degree. *See* N.Y. Penal Law § 125.25 (McKinney 2010).

6. Mr. Baker pleaded not guilty and was convicted upon these charges after a jury trial.

7. Mr. Baker appealed his conviction and sentence.

8. The facts of Mr. Baker's appeals are as follow:

    a. On April 15, 2014, Mr. Baker filed a motion under CPL § 440.10 to vacate his judgment of conviction. The motion was denied. (Ex. C-4.)

    b. On February 2, 2015, Mr. Baker sought leave to appeal the denial of the CPL § 440.10 motion, which was granted by Justice David Friedman. Mr. Baker filed a timely notice of appeal on February 17, 2015 and the appeal was consolidated with Mr. Baker's pending appeal of his conviction. The conviction and the denial of the CPL § 440.10 motion were affirmed by the First Department on May 26, 2016. *People v. Baker*, 139 A.D.3d 591, 592 (1st Dep't 2016); (Ex. B-1.)

    c. The federal constitutional issues presented in this petition for a writ of *habeas corpus* were raised in his appeal.

  d. Mr. Baker sought leave to appeal to the New York Court of Appeals. On October 24, 2016, the Honorable Eugene M. Fahey, Judge of the Court of Appeals, denied leave to appeal. *People v. Baker*, 28 N.Y.3d 1025, 1025 (2016) (Fahey, J.); (Ex. A-1.)

e. Mr. Baker has filed no other proceedings in state or federal court challenging his judgment of conviction and sentence.

**CITATIONS TO PETITIONER'S EXHIBITS**

9. Undersigned counsel is filing, contemporaneously with filing this Petition for a Writ of Habeas Corpus, exhibits containing relevant documents from the record in the State trial and appellate courts, as well as transcripts from the trial court. These Exhibits consist of three categories and are designated as Exhibit A through Exhibit C. References to the Exhibits and transcripts in this petition and accompanying memorandum of law will be cited as "Ex. [letter-number] at __"; "Jan. 13, 2010 Hr. Tr. __"; "Jan. 19, 2010 Hr. Tr. __"; "Trial Tr. [volume] __"; and "Sent. Tr. __"; respectively.

The Exhibits are as follows:

Exhibit A: Documents pertaining to the appeal to the New York Court of Appeals:

Exhibit A-1: Order of New York Court of Appeals, dated October 24, 2016, denying Leave to Appeal

Exhibit A-2: Respondent's Opposition to Defendant-Appellant's Application for Leave to Appeal

Exhibit A-3: Defendant-Appellant's Supplemental Letter in Support of Application for Leave to Appeal

Exhibit A-4: Order of New York Court of Appeals, dated July 18, 2016, assigning Application for Leave to Appeal to the Honorable Judge Fahey

Exhibit A-5: Defendant-Appellant's Application for Leave to Appeal

Exhibit B: Documents pertaining to the appeal to the New York Supreme Court, Appellate Division, First Department:

Exhibit B-1: Decision of New York Supreme Court, Appellate Division, First Department, dated May 26, 2016, affirming the judgment of the New York Supreme Court

Exhibit B-2: Reply Brief for Defendant-Appellant

Exhibit B-3: Brief for Respondent

Exhibit B-4: Brief for Defendant-Appellant

Exhibit B-5: Certificate of New York Supreme Court, Appellate Division, First Department, dated February 17, 2015, granting Leave to Appeal

Exhibit C: Documents pertaining to the CPL § 440.10 Motion to Vacate Mr. Baker's Judgment of Conviction:

Exhibit C-1: Decision of New York Supreme Court, Bronx County, dated September 3, 2014, denying the § 440 Motion to Vacate Judgment of Conviction

Exhibit C-2: Reply Memorandum of Law in Further Support of Defendant's Motion Pursuant to New York Criminal Procedural Law § 440.10(1) to Vacate Judgment of Conviction

Exhibit C-3: Affirmation of Emily Anne Aldridge and Memorandum of Law in Opposition

Exhibit C-4: Notice of Motion and Memorandum of Law in Support of Defendant's Motion Pursuant to New York Criminal Procedural Law § 440.10(1) to Vacate Judgment of Conviction

  Exhibit C-5: Affirmation of Katherine A. Marshall in Support of Motion to Vacate Judgment of Conviction, dated April 14, 2014, and exhibits thereto

  Exhibit C-6: Affidavit of Sean Baker, dated August 21, 2013

  Exhibit C-7: Affidavit of Lucinda Lewis, dated July 10, 2013

The Transcripts are as follows:

- January 13, 2010 Pre-Trial Hearing Transcript (Jan. 13, 2010 Hr. Tr. __.)
- January 19, 2010 Pre-Trial Hearing Transcript (Jan. 19, 2010 Hr. Tr. __.)
- April 6–20, 2010 Trial Transcript, Vols. I, II, and III (Trial Tr. [vol. I–III] __.)
- May 12, 2010 Sentencing Transcript (Sent. Tr. __.)

## GROUNDS OF UNCONSTITUTIONALITY OF PETITIONER'S CONVICTION AND SENTENCE

10. This petition for a writ of habeas corpus contains the basic facts in support of the constitutional issues presented by this case. A Memorandum of Law in support of the petition for a writ of habeas corpus is being filed contemporaneously with this petition. On the constitutional issues raised in this petition, the state court "adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

11. Mr. Baker was charged with murder in the second degree, N.Y. Penal Law § 125.25 (McKinney 2012). It was alleged that on October 6, 2007, Mr. Baker and two other individuals stole the wallet of a stranger, later identified as Mr. Ramiro Ramos-Luna, before one of those individuals, not Mr. Baker, pushed Mr. Ramos-Luna down a flight of stairs, to his death.

**Attorney Patrick Bruno is Appointed to Represent Sean Baker, but Fails to Meet or Communicate with Mr. Baker in Advance of Trial**

12. Attorney Patrick Bruno was first appointed to Mr. Baker's case in 2008, and that is when they first met, via video conference. (*See* Ex. C-6, Baker Aff. ¶ 17.) In the two years between that meeting and trial, Mr. Bruno met with Mr. Baker (outside of mandatory court appearances) for a total of no more than forty-five minutes.

13. For those two years, Mr. Bruno ignored Mr. Baker's repeated calls and neglected to provide any updates or documentation related to his case—some of which Mr. Baker explicitly requested, and to all of which he was constitutionally entitled. (*See id.* ¶ 23.) Mr. Bruno did not explain the case against Mr. Baker or the possible sentences that he faced—including a sentence of life imprisonment. (*See id.* ¶¶ 19, 29–33.)

14. Crucially, Mr. Bruno never explained to Mr. Baker what the felony-murder rule was, or that, as a result of that rule alone, Mr. Baker could be convicted of murder even though it was uncontrovertibly a codefendant who pushed Mr. Ramos-Luna to his death. Without a basic understanding of the felony-murder doctrine, Mr. Baker was unable to appreciate the strength of the case against him or properly weigh his sentencing exposure—stripping him of any ability to make informed decisions about his case. (*See id.* ¶¶ 17, 19, 24, 29.) The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel, *see* U.S. Const. Amend. VI, and Mr. Bruno denied Mr. Baker the benefit of this constitutional right by failing to counsel him in advance of trial.

**The Court Ignores Mr. Baker's Timely Motion for New Counsel**

15. On November 22, 2008, Mr. Baker filed a pro se Motion for Reassignment of Counsel in order to obtain a new lawyer. (*See* Ex. C-5, Marshall Aff. Ex. C ("Mot. for New Counsel").) In his motion, Mr. Baker argued that his case had been pending for over nine

months, during which Mr. Bruno had failed to visit him at his place of confinement, failed to inform him of any pertinent motions made, failed to conduct an investigation of the matter on his behalf, and failed to make any bail requests or reduction applications. (*See id.* ¶ 6.)

16. For reasons unknown, the court never addressed the motion or acknowledged its filing. (*See* Ex. C-6, Baker Aff. ¶ 26.) Mr. Baker, an indigent defendant with no knowledge of legal procedure—and certainly no one to aid him in his attempts to secure proper counsel—assumed, as any person in his position would, that the court had denied the motion. (*See id.*) Unaware that the court was required to entertain the motion in his presence, and understandably hesitant to raise the issue in open court on his own volition—at the risk of upsetting the judge who would preside over his case, and before the very counsel he was trying to replace—Mr. Baker thought he was out of options. (*See id.*) Had he known that he could raise the motion on his own, Mr. Baker would have done exactly that. (*See id.*)

17. The court's failure to consider Mr. Baker's motion for new counsel was not only detrimental to his case, but a violation of his Sixth Amendment right to counsel.

**Mr. Bruno Fails to Advise Mr. Baker on His Plea Offer**

18. At a pretrial hearing on January 13, 2010, Mr. Baker was asked whether he would plead guilty to a charge of manslaughter in exchange for a fourteen-year sentence, with five years of post-release supervision. (*See* Jan. 13, 2010 Hr. Tr. 10:10–10:17.) This was the first time Mr. Baker was told about a plea offer. (*See* Ex. C-6, Baker Aff. ¶ 27.) Mr. Bruno had never mentioned a plea offer to Mr. Baker before the pretrial hearing at which it was offered. (*Id.* ¶ 28.) Despite never having discussed the plea with Mr. Baker, and barely having discussed the case at all, Mr. Bruno did not ask the court for any time to speak with his client about the offer. (*See* Jan. 13, 2010 Hr. Tr. 10:10–12:17.)

19. At this most critical moment, when Mr. Baker's vulnerability and need for counsel were greatest, Mr. Bruno offered Mr. Baker no advice regarding whether he should accept the offer, nor did he even think to ask if Mr. Baker understood the offer. (Ex. C-6, Baker Aff. ¶¶ 28–31.) Mr. Bruno did not explain the crucial difference between determinate and indeterminate sentences; the evidence the People would bring against him; that he faced a life sentence, even though he wasn't the one to push the victim; or his slim chances of prevailing at trial in view of all of these considerations. (*See id.*)

20. Forced to make this critical decision on the spot, without the information or advice needed to make a knowing and informed decision, Mr. Baker rejected the plea offer. (*See id.* ¶ 34; Jan. 13, 2010 Hr. Tr. 10–12.) Mr. Baker maintains that had he known any of the above facts, or received adequate counsel, he would have pleaded guilty. (*See id.* ¶ 34.)

21. Mr. Baker suffered a constitutional violation due to lack of effective counsel at the plea-bargaining stage. *See United States v. Gordon*, 156 F.3d 376, 379 (2d Cir. 1998) (noting that the Sixth Amendment right to counsel attaches with full force at the plea-bargaining stage)

**<u>The Court Excludes Mr. Baker from a Critical Hearing</u>**

22. On April 6, 2010, the day before jury selection, the prosecutor moved for two protective orders pursuant to N.Y. CPL § 240.50. (*See* Trial Tr. I 15–16.) The first was sought in connection with a housing benefit being offered to the only two known eyewitnesses in the case—Denise and Barbara Coles—in exchange for their testimony against Mr. Baker and his codefendants. The second related to the identity of a previously undisclosed witness, later identified as Osvaldo (and later, Orlando) Vargas. Asked to articulate his reasons for excluding the defendants from the hearing regarding the protective order, the state prosecutor selected from a list of boilerplate options: "We'll go with danger of physical harm . . . . We can go law

enforcement, legitimate needs to be protected and security of the individual." (*Id.* 23.) Based on nothing more than this rote rationale, the court determined that it would hear the prosecution's protective-order applications outside Mr. Baker's presence. (*See id.* at 26:14–32:18.)

23. Although Mr. Baker's and his codefendant's attorneys were permitted to attend the hearing, they had almost no information about the subject matter of the hearing and were prohibited from sharing anything discussed at the hearing with their clients. (*Id.* 31.) None of the defendants were consulted or asked for consent.

24. Only outside Mr. Baker's presence did the prosecution disclose the full basis for its applications for protective orders. First, the prosecution revealed that Barbara and Denise Coles would receive new housing. (*See id.* 27–29.) According to the uncontested statements by the prosecution, the Coles' relocation was necessary because of supposed threats by an unknown person named "Day-Day." (*See id.*) Along those lines, Barbara Coles had apparently been approached by "somebody [who] tried to get her into an alley to discuss her testimony when she went out for a cigarette one night, and that was causing her great concern." (*See id.* 28:13–18.) Based on these threats, which bore no relation to Mr. Baker, the prosecution argued that a protective order was required to keep their identities secret—including from Mr. Baker—so that no one seeking to harm them would discover that they would be moved. (*Id.* 28:19–29:17.) The prosecution did not assert, and had no reason to believe, that Mr. Baker had anything to do with the supposed threats.

25. Next, the prosecutor revealed that a man named Osvaldo Vargas had told police that he "had seen three guys rob a Mexican on that morning and throw him down a flight of stairs." (*See id.* 28:20–25.) Since that tip, Mr. Vargas had not visited the prosecutor at his office or returned his two phone calls, but there was no evidence that Mr. Vargas' elusiveness had

anything to do with threats or fears for his safety. (*See id.* 30:3–25.) Without more, the prosecutor asserted that a protective order was justified.

26. On this meager showing, the trial court granted each application and prohibited counsel from disclosing any information from the hearing to Mr. Baker. (*See id*. 31:10–14.) Aside from learning that two protective orders were granted, Mr. Baker was told nothing of the effect of those orders or of their factual basis. (*See id.* 31–33.)

27. The right to presence is so fundamental that it finds its roots in two constitutional guarantees—the Due Process Clause of the Fifth Amendment and the Confrontation Clause of the Sixth. *See Tennessee v. Lane*, 541 U.S. at 532. Excluded from a critical hearing that happened behind closed doors and unable to confront his accusers, Mr. Baker was denied both of these constitutional guarantees.

**Mr. Bruno Abandons Mr. Baker at Sentencing**

28. Mr. Baker's sentencing proceeding was held on May 12, 2010. Prior to the sentencing hearing, Mr. Bruno was provided with a copy of the Pre-Sentence Report (the "PSR"). (*See* Ex. C-5, Marshall Aff. Ex. E.) The PSR was littered with errors, but Mr. Bruno did not attempt to correct a single one; in fact, he failed to even share the PSR with Mr. Baker or conduct his own investigation. (*See* Ex. C-6, Baker Aff. ¶¶ 39–41.) For example, the PSR stated that the defendant "caused the death of Ramiro Ramos-Luna, by throwing him down a flight of stairs," despite uncontroverted testimony that Mr. Allick, and not Mr. Baker, pushed Mr. Ramos-Luna down the stairs. (*See* Ex. C-5, Marshall Aff. Ex. E, at 2; Trial Tr. I 384:4–22; Trial Tr. II 12:8–11.) In addition, the PSR inexplicably stated that Mr. Baker was a member of "The Bloods" gang, even though Mr. Baker is not, and never has been, a member of any gang. (*See id.* at 3; Ex. C-6, Baker Aff. ¶ 44.) The prosecutor mentioned on the record that "[the

prosecution] had discussions with defense counsels [*sic*], [and] there may be one or two slight inaccuracies as they were recounted by the probation report," but Mr. Bruno never mentioned or specified, let alone corrected, any of them for the court. (*See* Sent. Tr. 3:19–5:12.)

29. After the prosecutor argued for the maximum possible sentence, the court provided Mr. Bruno an opportunity to speak on Mr. Baker's behalf. (*See* Sent. Tr. 5:6–12.) The errors in the prosecutor's description of the case were egregious and demonstrably prejudicial. (*Id.*) For instance, he misleadingly claimed that the "responsibility for the death of the deceased is directly attributable to both defendants equally" (*id.* 4:18–19), when the evidence showed that only Mr. Allick was responsible for pushing Mr. Ramos-Luna to his death. (*See* Trial Tr. I 384:4–22; Trial Tr. II 12:8–11.) Mr. Bruno did not correct the errors in the prosecutor's description of the case or even explain that, despite what the PSR said, Mr. Baker was not the one to physically cause Mr. Ramos-Luna's death. (*Id.* 5:6–12.)

30. Despite the significant mitigating evidence that existed, Mr. Bruno presented none; in fact, much of it was unknown to Mr. Bruno, due to his own failure to inquire about or investigate Mr. Baker's life circumstances. (*See id.*; Ex C-6, Baker Aff. ¶¶ 40–42, 46, 49.) Mr. Bruno made no suggestion of his own as to an appropriate sentence; made no request for leniency, despite Mr. Baker's young age; and did not address the prosecutor's request for the maximum possible sentence. (*See id.* ¶¶ 39–50.)

31. The full extent of Mr. Bruno's advocacy at sentencing consisted of a single statement against Mr. Baker's interest:

> Your Honor, there is nothing I could add. You were present for the jury trial, you obviously paid very careful attention. I would be foolish to rehash any facts at this time. (Sent. Tr. 5:18–11.)

32. Mr. Bruno also failed to explain to Mr. Baker that he could make his own statement and that it would be beneficial for him to do so. (*See* Ex. C-6, Baker Aff. ¶ 39.) When the court asked if he wanted to make a statement, Mr. Baker was unprepared and unsure whether speaking would help or hurt his chances. (*See id.* ¶ 50.) Though sincerely remorseful about Mr. Ramos-Luna's death, Mr. Baker did not express his feelings to the court, having yet again been left to make a crucial decision without any aid from counsel. (*See id.*; Sent. Tr. 5:13–15.)

33. A criminal defendant's Sixth Amendment right to "effective assistance from his attorney at all critical stages in the proceeding" extends to sentencing, *see Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013), and Mr. Baker was denied effective assistance—indeed, any assistance at all—during his sentencing.

**Mr. Bruno Fails to Present Mitigating Evidence**

34. In preparation for trial and sentencing, Mr. Bruno never asked Mr. Baker any questions about his family or upbringing (*see* Ex. C-6, Baker Aff. ¶ 25) and never spoke with his mother or any other family member about his trying past. (*See* Ex. C-7, Lewis Aff. ¶¶ 12, 23.) Although Mr. Baker's mother took it upon herself to call Mr. Bruno several times, Mr. Bruno was rarely available and never returned her messages. (Ex. C-7, Lewis Aff. ¶ 4.)

35. In truth, Mr. Baker's mother struggled financially and emotionally while raising Mr. Baker and his six siblings. (*See* Ex. C-6, Baker Aff. ¶ 5; Ex. C-7, Lewis Aff. ¶ 13.) Mr. Baker was shuffled in and out of domestic-violence shelters and foster homes for nearly his entire childhood (*see* Ex. C-6, Baker Aff. ¶¶ 5, 6–8; Ex. C-7, Lewis Aff. ¶¶ 15–16), beginning at the age of five, when he was placed in foster care because of family court accusations that his mother burned his sister. (*See* Ex. C-6, Baker Aff. ¶¶ 7–10.) Separated from his siblings and abused by his foster family, Mr. Baker suffered through his time in foster care, the lasting effects

of which have required counseling. (Ex. C-6, Baker Aff. ¶ 9; Ex. C-7, Lewis Aff. ¶¶ 16–18.) After Mr. Baker returned to his mother's home at the age of seven, he and his siblings were physically and psychologically abused by his father, who had a history of substance abuse. (*See* Ex. C-6, Baker Aff. ¶ 6; Ex. C-7, Lewis Aff. ¶ 14.) When Mr. Baker was twelve years old, his father left the family altogether (*see* Ex. C-7, Lewis Aff. ¶ 14), and Mr. Baker spent the rest of his childhood and early teen years living in shelters, changing schools at least ten times. (*See* Ex. C-6, Baker Aff. ¶¶ 11, 13–16; Ex. C-7, Lewis Aff. ¶ 14.) Knowing nothing of Mr. Baker's hardships—because he had never bothered to ask—Mr. Bruno presented none of this information to the court.

**REQUIRED INFORMATION**

36. There are no petitions or appeals pending presently in any state or federal court relating to the judgment under attack. Mr. Baker was represented by the following attorneys:

a. In the trial court by Patrick Bruno, Esq., since deceased.

b. On appeal, by Richard Greenberg, of the Office of the Appellate Defender.

37. Mr. Baker is not serving any sentence other than the sentence under attack in this proceeding.

WHEREFORE, Petitioner Sean Baker prays that this Court:

1. Issue a writ of habeas corpus to have Petitioner brought before it to the end that he may be discharged from his unconstitutional confinement;

2. Require Respondent to furnish a transcript of the entire trial and state post-conviction record pursuant to Rule 5 of the Rules Governing § 2254 Cases in the United States District Courts; and

3. Grant such other and further relief as may be just and proper.

Dated: New York, New York
January 18, 2018

JOSEPH M. NURSEY, ESQ.
JNursey@appellatedefender.org
OFFICE OF THE APPELLATE DEFENDER
11 Park Place, Suite 1601
New York, NY 10007
(212) 402-4100

By: ______________________
Ryan W. Cooke
*Of Counsel*

RYAN W. COOKE, ESQ.
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000
Ryan.cooke@davispolk.com

*Attorneys for Petitioner*

I declare under penalty of perjury that the facts contained in the foregoing Petition for a Writ of *Habeas Corpus* are true and correct.

SEAN BAKER
Petitioner

DATED: Pine City, New York
December 18, 2017

Sworn to me this 18th day of December, 2017.

NOTARY PUBLIC

ROSEMARY HERBERT
Notary Public, State of New York
No. 02HE5083769
Qualified in Westchester County
Commission Expires August 25, 2021