UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————

)
)
SEAN BAKER,                         )                No. _____
)
             Petitioner,        )
)
    - against -                    )
)
PAUL PICCOLO, Superintendent,       )
Southport Correctional Facility,    )
)
           Respondent.        )
)
)
————————————————————

**MEMORANDUM OF LAW
IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS**

JOSEPH M. NURSEY, ESQ.
JNursey@appellatedefender.org
OFFICE OF THE APPELLATE DEFENDER
11 Park Place, Suite 1601
New York, NY 10007
(212) 402-4100


RYAN W. COOKE, ESQ.
Ryan.cooke@davispolk.com
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

*Attorneys for Petitioner*

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ..................................................................................................1

JURISDICTION AND VENUE .................................................................................................2

TIMELINESS .............................................................................................................................2

STATEMENT OF EXHAUSTION ............................................................................................3

STATEMENT OF FACTS .........................................................................................................4

A. The Underlying Crime ....................................................................................................4

B. The Court Ignores Mr. Baker's Timely Motion for New Counsel ................................5

C. Mr. Bruno Fails to Advise Mr. Baker on His Plea Offer...............................................7

D. The Court Excludes Mr. Baker from a Critical Hearing ................................................8

E. Mr. Bruno Compounds His Failings Before Trial by Abandoning Mr. Baker at
   Sentencing.....................................................................................................................10

F. Mr. Bruno Fails to Discover or Present Readily Available Mitigating Evidence ........12

G. The Trial Court Unreasonably Denies Mr. Baker's Challenge to His Judgment of
   Conviction and Sentence ..............................................................................................14

H. The Appellate Division Unreasonably Denies Mr. Baker's Appeal of His Judgment of
   Conviction and Sentence ..............................................................................................15

STANDARD OF REVIEW ......................................................................................................16

ARGUMENT ............................................................................................................................18

I. MR. BAKER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO COUNSEL
   WHEN THE TRIAL COURT IGNORED HIS MOTION FOR NEW COUNSEL .............18

    A. Mr. Baker's Motion for New Counsel Was Timely .......................................................20

    B. The State Court Failed to Conduct Any Inquiry .............................................................20

    C. Mr. Bruno's Lack of Communication Amounted to a Breakdown of the Attorney-
        Client Relationship ........................................................................................................22

II. MR. BRUNO'S INCOMPETENCE DENIED MR. BAKER HIS SIXTH
   AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL
   AT THE PLEA STAGE .................................................................................................22

    A. The *Strickland* Standard Applies to Claims of Ineffective Assistance at the Plea-
        Bargaining Stage ...........................................................................................................23

    B. The State Court Unreasonably Applied *Strickland* and Its Progeny .............................24

        1. Mr. Bruno's Advice—or Lack Thereof—Regarding the Plea Offer Was
            Deficient ...............................................................................................................25

    2.   *Mr. Bruno's Lack of Counsel Caused Mr. Baker to Reject the Plea Offer, Which He Otherwise Would Have Taken* ..............................................28

  C.  Alternatively, Mr. Baker Is Entitled to the Benefit of the Rejected Plea Offer ..............30

III. MR. BRUNO'S ABANDONMENT OF MR. BAKER AT SENTENCING DENIED MR. BAKER HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL..............................................................................................31

  A.  The *Cronic* Presumption of Prejudice Is Appropriate Because Mr. Bruno Failed to Perform the Role of Advocate at Sentencing ..................................................31

  B.  Even if the *Strickland* Standard Governs, the State Court Unreasonably Denied Mr. Baker's Claim ....................................................................................................33

    1.   *Mr. Bruno's Performance at Sentencing Was Deficient* ..........................35

    2.   *Mr. Bruno's Inadequate Performance Prejudiced Mr. Baker* ................37

IV. THE STATE COURT DENIED MR. BAKER HIS CONSTITUTIONAL RIGHT TO PRESENCE BY UNREASONABLY EXCLUDING HIM FROM A MATERIAL PRE-TRIAL HEARING..........................................................................................................40

  A.  The State Court Violated Mr. Baker's Constitutional Right to Be Present When It Barred Him from a Fact-Intensive Pre-Trial Hearing, thus Handicapping His Ability to Confront the Only Two Testifying Eyewitnesses Against Him..................................41

    1.   *Mr. Baker Was Entitled to Be Present at The April 6 Hearing, which Involved Factual Matters with Which Mr. Baker Was Best Positioned to Meaningfully Assist*..............................................................................................................42

    2.   *Mr. Baker's Exclusion Impaired His Right to Cross-Examination and thus Undercut His Ability to Defend Against His Charge* ................................43

    3.   *The Second Circuit's Ruling in* Grayton *all but Dictates that Mr. Baker Was Stripped of His Right to Presence* ..........................................................45

  B.  The State Court Unreasonably Excluded Mr. Baker Under the Guise of Vague, Unsubstantiated Claims of Witness Safety..................................................................46

  C.  Mr. Baker Did Not Waive His Constitutional Right to Be Present, and His Exclusion Was Anything but Harmless.........................................................................46

CONCLUSION....................................................................................................................47

# TABLE OF AUTHORITIES

### CASES

PAGE(S)

*Anders v. California,*
  386 U.S. 738 (1967) ................................................................................................32

*Avery v. Alabama,*
  308 U.S. 444 (1940) ................................................................................................32

*Bell v. Cone,*
  535 U.S. 685 (2002) ...........................................................................................32, 33

*Boria v. Keane,*
  99 F.3d 492 (2d Cir. 1996),
  *decision clarified on reh'g*, 90 F.3d 36 (2d Cir. 1996)..........................................24

*Brown v. Griffin,*
  No. 13-cv-1352, 2016 WL 4382668 (S.D.N.Y. May 12, 2016) ............................21

*Caplin & Drysdale, Chartered v. United States,*
  491 U.S. 617 (1989) ................................................................................................18

*Carmichael v. Chappius,*
  848 F.3d 536 (2d Cir. 2017) ...................................................................................17

*Carrion v. Smith,*
  644 F. Supp. 2d 452 (S.D.N.Y. 2009),
  *aff'd*, 365 F. App'x. 278 (2d Cir. 2010). ..............................................26, 27, 29, 30

*Clark v. Stinson,*
  214 F.3d 315 (2d Cir. 2000) ...................................................................................42

*Davis v. Alaska,*
  415 U.S. 308 (1974) ................................................................................................44

*Davis v. Greiner,*
  428 F.3d 81 (2d Cir. 2005) .....................................................................................24

*Delaware v. Van Arsdall,*
  475 U.S. 673 (1986) ................................................................................................44

*Diaz v. United States,*
  223 U.S. 442 (1912) ................................................................................................40

*Evans v. Fischer,*
  712 F.3d 125 (2d Cir. 2013) ...................................................................................17

*Faretta v. California*,
   422 U.S. 806 (1975) .................................................................................40

*Ferri v. Ackerman*,
   444 U.S. 193 (1979) .................................................................................35

*Francis S. v. Stone*,
   221 F.3d 100 (2d Cir. 2000) ....................................................................33

*Glover v. United States*,
   531 U.S. 198 (2001) ...........................................................................31, 37

*Gonzalez v. United States*,
   722 F.3d 118 (2d Cir. 2013) ............................................................ *passim*

*Grayton v. Ercole*,
   691 F.3d 165 (2d Cir. 2012) .........................................................40, 44, 45

*Harris v. Nelson*,
   394 U.S. 286 (1969) .................................................................................47

*Hill v. Lockhart*,
   474 U.S. 52 (1985) ...................................................................................23

*Jackson v. Johnson*,
   150 F.3d 520 (5th Cir. 1998) ...................................................................32

*Kentucky v. Stincer*,
   482 U.S. 730 (1987) .........................................................................42, 43, 44

*Knowles v. Mirzayance*,
   556 U.S. 111 (2009) .................................................................................17

*Lafler v. Cooper*,
   566 U.S. 156 (2012) ......................................................................... *passim*

*Lewis v. McGinnis*,
   No. 9:04-CV-32, 2008 WL 833964 (N.D.N.Y. Mar. 27, 2008) .....................17, 18

*Lewis v. United States*,
   146 U.S. 370 (1892) .................................................................................40

*Lopez v. Graham*,
   No. 10-CV-0468, 2012 WL1865502 (E.D.N.Y. 2012) .........................18, 19, 20, 21

*McCleskey v. Zant*,
   499 U.S. 467 (1991) .................................................................................47

*McKee v. Harris*,
   649 F.2d 927 (2d Cir. 1981) .............................................................18, 19, 21

*Miller v. Martin,*
  481 F.3d 468 (7th Cir. 2007) ...................................................................32, 33

*Missouri v. Frye,*
  566 U.S. 134 (2012) ....................................................................................23

*Moran v. Burbine,*
  475 U.S. 412 (1986) ....................................................................................46

*Padilla v. Kentucky,*
  130 S. Ct. 1473 (2010) ................................................................................24

*People ex rel. Harrington v. Cully,*
  958 N.Y.S.2d 633 (4th Dep't 2013) .............................................................3

*People ex rel. Kaplan v. Comm'r of Corr. of City of N.Y.*
  60 N.Y.2d 648 (1983) ...................................................................................3

*People v. Baker,*
  139 A.D.3d 591 (1st Dep't 2016) .................................................................3

*People v. Dokes,*
  79 N.Y.2d 656 (1992) .................................................................................42

*People v. Hill,*
  979 N.Y.S.2d 737 (4th Dep't 2014) ...........................................................27

*Pham v. United States,*
  317 F.3d 178 (2d Cir. 2003) .......................................................................28

*Porter v. McCollum,*
  558 U.S. 30 (2009) .........................................................................34, 36, 39

*Rushen v. Spain,*
  464 U.S. 114 (1983) ....................................................................................41

*Shiwlochan v. Portuondo,*
  345 F. Supp. 2d 242 (E.D.N.Y. 2004),
  *aff'd*, 150 F. App'x 58 (2d Cir. 2005) ...................................................17, 28

*Shorter v. Corcoran,*
  No. 05-CV-0417, 2009 WL 3165608 (W.D.N.Y. Sept. 28, 2009) ...........21

*Snyder v. Massachusetts,*
  291 U.S. 97 (1934) ................................................................................42, 43

*Strickland v. Washington,*
  466 U.S. 668 (1984) .......................................................................... *passim*

*Tennessee v. Lane,*
  541 U.S. 509 (2004) ....................................................................................40

*United States v. Calabro,*
    467 F.2d 973 (2d Cir. 1972) ...................................................................21

*United States v. Cronic,*
    466 U.S. 648 (1984) ................................................................... *passim*

*United States v. Day,*
    969 F.2d 39 (3d Cir. 1992) ......................................................................30

*United States v. Doe # 1,*
    272 F.3d 116 (2d Cir. 2001) ....................................................................18

*United States v. Fontanez,*
    878 F.2d 33 (2d Cir. 1989) ..................................................................40, 47

*United States v. Gordon,*
    156 F.3d 376 (2d Cir. 1998) ..................................................... 23, 24, 28, 30

*United States v. Morgan,*
    51 F.3d 1105 (2d Cir. 1995) ....................................................................46

*United States v. Morrison,*
    449 U.S. 361 (1981) ...............................................................................30

*United States v. Theodore,*
    468 F.3d 52 (1st Cir. 2006) ......................................................................32

*United States v. White,*
    341 F.3d 673 (8th Cir. 2003) ....................................................................32

*White v. Woodall,*
    134 S. Ct. 1697 (2014) ............................................................................17

*Wiggins v. Smith,*
    539 U.S. 510 (2003) ............................................................................... 36

*Williams v. Artuz,*
    237 F.3d 147 (2d Cir. 2001) ......................................................................3

*Williams v. Taylor,*
    529 U.S. 362 (2000) ..........................................................................17, 36

*Wilson v. Mazzuca,*
    570 F.3d 490 (2d Cir. 2009) ....................................................................25

*Yarborough v. Alvarado,*
    541 U.S. 652 (2004) ...............................................................................42

## CONSTITUTION

U.S. Const. amend. V.................................................................................................40

U.S. Const. amend. VI .......................................................................................... *passim*

U.S. Const. amend. XIV ....................................................................................... 15, 40

## STATUTES & RULES

28 U.S.C. § 2241(d) .................................................................................................... 2

28 U.S.C. § 2244(d)(1) ............................................................................................... 2

28 U.S.C. § 2244(d)(1)(A).......................................................................................... 3

28 U.S.C. § 2254 ..................................................................................................... 2, 47

28 U.S.C. § 2254(a) .................................................................................................... 2

28 U.S.C. § 2254(b)(1)(A) .......................................................................................... 3

28 U.S.C. § 2254(d)(1)–(2).......................................................................................... 16

N.Y. Crim. Proc. Law § 240.50 ................................................................................... 8

N.Y. Crim. Proc. Law § 240.50(1) .............................................................................. 9

N.Y. Crim. Proc. Law § 440 .................................................................................. 14, 15

N.Y. Crim. Proc. Law § 440.10 ................................................................................... 26

N.Y. Crim. Proc. Law § 440.10(1) .............................................................................. 14

N.Y. Crim. Proc. Law § 440.30(5) .............................................................................. 27

## OTHER AUTHORITIES

3A Charles Alan Wright, Federal Practice and Procedure § 721.1 (2d ed. 1982) .......................42

> *"That a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command.  The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results."*

> -*Strickland v. Washington*, 466 U.S. 668, 685 (1984)

## PRELIMINARY STATEMENT

This case is about a lawyer abandoning his client.  At the most critical stages of Sean Baker's trial and sentencing, he received no assistance from counsel.  None.  If the constitutional guarantee of the assistance of counsel means anything more than a warm body at counsel table, Mr. Baker's conviction and sentence must be undone.

First, at the pre-trial stage, unaware of a plea offer and uninformed about his case, the import of the felony-murder rule, his sentence exposure, or his prospects at trial, nineteen-year-old Sean Baker was forced to make the crucial decision of whether to accept a plea agreement without a word of advice from his counsel.  Then, at sentencing, when Mr. Baker desperately needed an advocate to tell his story of hardship, express his deep remorse, underscore his limited role in the crime, and show his true capacity for rehabilitation—his counsel was silent.  Silent, that is, except to say:

> Your Honor, there is nothing I could add.  You were present for the jury trial, you obviously paid very careful attention.  I would be foolish to rehash any facts at this time.

Mr. Baker received counsel in name only.  The Constitution demands more.

All of this could have been avoided: Mr. Baker notified the trial court of the incompetent representation he was receiving well before trial.  Rather than hear Mr. Baker's complaints about his counsel, Patrick Bruno, and appoint new, suitable representation, the court did nothing.  In fact, the court never acknowledged—let alone addressed—the motion for new counsel that Mr.

Baker filed. It inexplicably abdicated its role to ensure Mr. Baker's constitutional right to counsel.

Finally, the trial court unreasonably excluded Mr. Baker from a critical pre-trial hearing he was constitutionally entitled to attend. Because of his exclusion, Mr. Baker was kept in the dark as to whether the only two eyewitnesses in the case would testify in exchange for housing benefits—gutting his ability to adequately cross-examine them at trial.

Mr. Baker's conviction and sentence are fraught with constitutional deprivations and corresponding harm. Under the circumstances, it is impossible to have confidence in the outcome of his case. Justice demands that his conviction and sentence be undone.

## JURISDICTION AND VENUE

Jurisdiction is proper under the Antiterrorism and Effective Death Penalty Act ("AEDPA") because Mr. Baker is "in custody" at the New York Southport Correctional Facility pursuant to a conviction for second-degree murder and a sentence of twenty years to life in prison, which he is attacking through this Petition. 18 U.S.C. § 2254(a).

An action under 28 U.S.C. § 2254 may be filed in either "the district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him." 28 U.S.C. § 2241(d). Mr. Baker was convicted in the Supreme Court for Bronx County; thus, venue is proper in the Southern District of New York.

## TIMELINESS

This petition is timely under the provisions of 28 U.S.C. § 2244(d)(1) because it is brought within one year of the date that Mr. Baker's conviction became final by the conclusion of direct review. The New York Court of Appeals denied Mr. Baker leave to appeal on October

24, 2016. *People v. Baker*, 139 A.D.3d 591 (1st Dep't 2016). (*See also* Ex. A-1.)[1] Mr. Baker's direct review concluded on January 23, 2017, the date on which Mr. Baker's time to seek direct review via certiorari expired. See 28 U.S.C. § 2244(d)(1)(A); *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001) (holding that the one-year clock under § 2244(d)(1)(A) "does not begin to run until the completion of direct appellate review in the state court system and either the completion of certiorari proceedings in the United States Supreme Court, or—if the prisoner elects not to file a petition for certiorari—the time to seek direct review via certiorari has expired").

## STATEMENT OF EXHAUSTION

Mr. Baker has exhausted all available state remedies as required by AEDPA with respect to all of the claims raised in this petition, having fairly presented those claims to the state courts on direct review of his conviction and sentence. 28 U.S.C. § 2254(b)(1)(A). Mr. Baker's claims were adjudicated on the merits by the Appellate Division, First Department of the New York Supreme Court, as reflected in that court's May 26, 2016 opinion—the last reasoned decision on Mr. Baker's claims. *People v. Baker*, 139 A.D.3d 591, 592 (1st Dep't 2016). (*See also* Exs. A, B.) Mr. Baker exhausted his state remedies when he sought leave to appeal to the New York Court of Appeals.[2] (Ex. A.)

---

[1] Citations to "Ex. __" refer to the exhibits filed in connection with Mr. Baker's Petition and this accompanying memorandum of law. (*See* Petition ¶ 9.)

[2] In New York, state habeas corpus proceedings are not available for petitioners, like Mr. Baker, who seek relief in the form of a new trial rather than immediate release from custody. *See People ex rel. Kaplan on Behalf of Fuentes v. Comm'r of Corr. of City of N.Y.*, 60 N.Y.2d 648, 649 (1983) (noting that a person "is not entitled to habeas corpus relief [when] the only remedy to which he would be entitled would be a new trial or new appeal, and not a direction that he be immediately released from custody"); *People ex rel. Harrington v. Cully*, 958 N.Y.S.2d 633, 633 (4th Dep't 2013) ("It is well established that a petition for habeas corpus relief is not a proper vehicle for raising a contention of ineffective assistance of counsel.").

## STATEMENT OF FACTS

### A.    The Underlying Crime

In the early morning hours of October 6, 2007, a grainy surveillance video registered three young, barely recognizable men approaching a drunken stranger exiting a restaurant in Bronx County, New York.  (*See* Trial Tr. II 317:22–319:7.)[3]  Reaching the man, Mr. Ramiro Ramos-Luna, the three young men appear to circle him before walking out of the picture.  The video does not tell the story of what followed, but when paramedics and officers responded to the scene, they found Mr. Ramos-Luna at the bottom of a nearby flight of stairs, injured and nonresponsive.  (*See id.* 94–98.)  Mr. Ramos-Luna was taken to a nearby hospital, where he died from his injuries a few hours later.  (*Id.* 100.)

Despite interviewing several people at the scene, the police were originally unable to find anyone who witnessed the crime.  The police were able to obtain the surveillance video but "couldn't make out faces from the video" sufficient for an identification.  (*See id.* 234:16–17.)  With no real leads, the police resorted to posting fliers throughout the neighborhood soliciting information about the incident.  (*See id.* 235:6–12.)  Sometime thereafter, the police received an anonymous call stating that Cory Sumlin was responsible for Mr. Ramos-Luna's death.  (*See* Trial Tr. I 17:7–22.)  With Mr. Sumlin as their only suspect in January 2008, the police decided to interview Barbara Coles, the mother of Mr. Sumlin's child.  Barbara Coles later testified that, when the police first interviewed her, she believed they were trying to "pin" the crime on Mr. Sumlin.  (*See id.* 26–30, 58:24-59:3.)  Ms. Cole directed the police to other suspects.

As the police discovered during their interview, Barbara and her mother, Denise Coles, were standing outside the nearby restaurant when Mr. Ramos-Luna was robbed.  Both women

---

[3] Citations to the transcript of the pretrial hearings, the trial, and the sentencing proceeding are noted as "Jan. 13, 2010 Hr. Tr. __"; "Jan. 19, 2010 Hr. Tr. __"; "Trial Tr. [vol. I–III] __"; and "Sent. Tr. __"; respectively.

knew Sean Baker socially and identified Mr. Baker and his two codefendants, Michael Allick
and Kareem Warner, as the three young men in the video. (*See* Trial Tr. II 5:20–9:22, 68:14–
70:8.) According to these witnesses, the three men together stole Mr. Ramos-Luna's wallet
before Mr. Allick alone pushed Mr. Ramos-Luna, causing him to sustain injuries to which he
later succumbed. (*See id.* 10:6–12:11.)

Only the recollections of Barbara and Denise Coles implicated Mr. Baker in the robbery
of Mr. Ramos-Luna, which occurred outside the view of the surveillance video. According to
both women, Mr. Baker was not the one to push Mr. Ramos-Luna. (*See id.* at 6–8, 12, 74.) That
version of events was later confirmed during Kareem Warner's plea allocution, when Mr.
Warner admitted responsibility for stealing Mr. Ramos-Luna's wallet but reiterated that only
Michael Allick—and not Mr. Baker—pushed Mr. Ramos-Luna down the stairs. (*See* Trial Tr. I
384:12–14.) Mr. Warner accepted a plea bargain to first-degree robbery in exchange for a
determinate sentence of eight years with five years of post-release supervision.[4] (*See id.* 379–
391.)

Had Mr. Baker received proper counsel, he too would have pleaded guilty and likely
received a sentence similar to Mr. Warner's. Instead, without the benefit of adequate counsel,
Mr. Baker proceeded to trial.

## B.    The Court Ignores Mr. Baker's Timely Motion for New Counsel

Mr. Baker met his attorney, Patrick Bruno, via video conference when Mr. Bruno was
first appointed to his case in 2008. (*See* Ex. C-6, Baker Aff. ¶ 17.) In the two years to follow,
when Mr. Bruno should have been preparing for trial, Mr. Bruno met with Mr. Baker outside of
scheduled court appearances for no more than forty-five minutes. (*See id.* ¶¶ 17, 20.) For two

---

[4] The prosecution's initial plea offer to Mr. Warner was twelve years, but his counsel managed to negotiate
it down to eight.

years, Mr. Bruno disregarded Mr. Baker's repeated calls and neglected to provide any case updates or documentation related to his case, some of which Mr. Baker explicitly asked for, and all of which he was constitutionally entitled to.  (*See id.* ¶ 23.)  Not once did Mr. Bruno explain the formidable case against Mr. Baker or the lengthy sentence that he was facing.  (*See id.* ¶¶ 19, 29–33.)  But Mr. Bruno's single greatest failing in this pre-trial period was that he never explained to Mr. Baker what the felony-murder rule was and that, as a result of that rule, he could (and likely would) be convicted of murder even though it was undisputed that Mr. Allick alone pushed Mr. Ramos-Luna to his death.  (*See id.* ¶¶ 1, 38)  Without that basic understanding of the law, Mr. Baker was unable to appreciate the strength of the case against him or properly weigh his sentencing exposure—stripping him of the ability to make informed decisions about his case.  (*See id.* ¶¶ 17, 19, 24, 29–38.)

In fact, Mr. Baker and his mother, Ms. Lewis, were so concerned about the quality of Mr. Bruno's representation that Ms. Lewis tried to hire another attorney to replace Mr. Bruno, only she could not afford the large cash retainer.  (*See* Ex. C-7, Lewis Aff. ¶ 10.)

Aware of Mr. Bruno's failure to provide him with any advice or counsel, and concerned by what that might mean for his case, Mr. Baker took matters into his own hands—or tried to. On November 22, 2008, Mr. Baker filed a pro se Motion for Reassignment of Counsel in the hopes of obtaining a lawyer who would provide even a modicum of legal assistance.  (*See* Ex. C-5, Marshall Aff. Ex. C, ("Mot. for New Counsel").)[5]  Mr. Baker filed his motion on the form designated for that purpose and indicated his substantial complaints.[6]  But nothing happened.

---

[5] Exhibit C to the Affirmation of Katherine Marshall (Ex. C-5) consists of Mr. Baker's motion for the assignment of a private investigator and, as relevant here, his motion for new counsel.

[6] Mr. Baker's affidavit in support of that motion stated that Mr. Bruno had failed to: "[v]isit [Mr. Baker] at [his] place of confinement; [i]nform [Mr. Baker] of any pertinent motion[s] made . . . on [his] behalf; [c]onduct an investigation in the matter of this action on [Mr. Baker's] behalf; [or] [m]ake any bail requests or reduction application on [Mr. Baker's] behalf."  (Ex. C-5, Marshall Aff. Ex. C.)

The court never addressed or acknowledged the motion.  (*See* Ex. C-6, Baker Aff. ¶ 26.) Mr. Baker, an indigent defendant with no knowledge of legal procedure—and certainly no counsel to aid him in his attempts to secure a competent lawyer—assumed, as any person in his position would, that the court had denied the motion.  (*See id.*)  Unaware that the court was required to entertain the motion in his presence and understandably hesitant to raise the issue in open court on his own volition—at the risk of upsetting the judge who would preside over his case, and before the very counsel he was trying to replace—Mr. Baker believed he was out of options.  (*See id.*)  Had he known that he could raise the motion orally before the trial court, Mr. Baker would have done exactly that.  (*See id.*)  As with all other aspects of his case, Mr. Baker was on his own; Mr. Bruno neither counseled Mr. Baker to raise the motion with the court nor took it upon himself to do so.

**C.    Mr. Bruno Fails to Advise Mr. Baker on His Plea Offer**

At a pretrial hearing on January 13, 2010, Mr. Baker was asked whether he would plead guilty to a charge of manslaughter in exchange for a fourteen-year sentence, with five years of post-release supervision.  (*See* Jan. 13, 2010 Hr. Tr. 10:10–10:17.)  This was the first time Mr. Baker heard of a plea offer.  (*See* Ex. C-6, Baker Aff. ¶ 27).  Mr. Bruno had never mentioned a plea offer to Mr. Baker before the pretrial hearing at which it was offered.  (*Id.* ¶ 28.) Inexplicably, Mr. Bruno did not ask the court for time to discuss the offer with his client, despite never before having discussed the plea with Mr. Baker and barely having discussed the case at all.  (*See* Jan. 13, 2010 Hr. Tr. 10:10–12:17.)

At this most critical moment, when Mr. Baker's vulnerability and need for counsel were greatest, Mr. Bruno offered Mr. Baker no advice regarding whether he should accept the offer, nor did he think to ask if Mr. Baker understood the offer.  (Ex. C-6, Baker Aff. ¶¶ 28–31.)  Mr. Bruno did not explain the crucial difference between determinate and indeterminate sentences,

the evidence the prosecution would bring against Mr. Baker, or his slim chances at trial. (*See id.*) In fact, Mr. Baker did not even learn that a life sentence was on the table until the prosecutor stated as much at trial. (*Id.* ¶ 31.) By failing to educate Mr. Baker on the import of the felony-murder rule—that Mr. Baker could be found guilty despite not being the person to take Mr. Ramos-Luna's wallet or push him down the stairs (*id.* ¶¶ 17, 38)—Mr. Bruno hindered Mr. Baker's ability to weigh these competing considerations and make an informed plea on his own. And by not informing Mr. Baker of the offer sooner, Mr. Bruno made it impossible for Mr. Baker—then a teenager—to discuss the offer with anyone, including his family. (*See id.* ¶ 29.)

Blindsided by the offer, and forced to make an on-the-spot decision that was neither knowing nor informed, Mr. Baker rejected the plea deal. (*See id.* ¶ 34; Jan. 13, 2010 Hr. Tr. 10–12.) Mr. Baker maintains that, had he known any of the above facts, or received adequate counsel, he would have pleaded guilty. (*See id.* ¶ 34.) To be sure, Mr. Baker had professed his innocence prior to trial, but he was not opposed to accepting a plea agreement in general (*See id.* ¶ 30), and in fact, had previously accepted a plea deal in a different case, where his attorney had explained in detail the evidence the prosecution had against him and the sentence he could face if he went to trial.[7] (*Id.*) Mr. Bruno provided no explanation whatsoever.

**D.    The Court Excludes Mr. Baker from a Critical Hearing**

On April 6, 2010, the day before jury selection was slated to begin, the prosecutor moved for two protective orders pursuant to CPL § 240.50.[8] (*See* Trial Tr. I 15–16.) The first was sought in connection with a housing benefit being offered to the only two known eyewitnesses in the case—Denise and Barbara Coles—in exchange for their potential testimony against Mr.

---

[7] That case, involving a charge of robbery in the third degree, was Mr. Baker's only prior conviction. Mr. Baker received five years of probation for that charge as per his plea agreement.

[8] For ease of reference, we will refer to this hearing as the "April 6 Hearing."

Baker and his codefendants. The second related to the identity of a previously undisclosed witness, later identified as Osvaldo Vargas.[9] After the prosecution balked at having to articulate its reasons for the requested orders in open court, the court asked the prosecutor to choose one of the permissible reasons listed in CPL § 240.50(1) as the court read them aloud. (*See id.* 22–26.) Eventually the prosecutor replied, "We'll go with danger of physical harm. . . . We can go law enforcement, legitimate needs to be protected and security of the individual." (*Id.* 23). These extemporaneous "rationales" were the only reasons given for the protective orders in open court. (*See id.* 22–26.)

After the prosecution recited its boilerplate rationale, and without any explanation or argument on the matter, the trial court determined that it would hear the applications outside the presence of the defendants. (*See id.* at 26:14 – 32:18.) Although the defendants' attorneys were permitted to attend, they had little information about the subject matter of the hearing and were prohibited from sharing any of the information discussed at the hearing with their clients. (*Id.* 31.) Bewilderingly, after first objecting to the requested ex parte hearing, the defendants' attorneys each consented to their clients' absence; neither Mr. Baker nor his codefendants, however, were asked for nor gave consent—they were ordered to remain in the courtroom while the hearing occurred in the jury room.

Only outside Mr. Baker's presence did the prosecutor disclose the basis for his applications. First, for their part in testifying, Barbara and Denise Coles would receive new housing. (*See id.* 27–29.) According to the uncontested statements by the prosecutor, the Coles' relocation was necessary because of supposed threats by an unknown person named "Day-Day." (*See id.*) Along those lines, Barbara Coles had apparently been approached by "somebody [who]

---

[9] In the days following, the prosecution would reveal that Mr. Vargas' first name was Orlando, not Osvaldo, as they had previously reported during the April 6 Hearing. (Trial Tr. I 65.)

tried to get her into an alley to discuss her testimony when she went out for a cigarette one night, and that was causing her great concern." (*See id.* 28:13–18.) Based on these threats, which bore no connection to Mr. Baker, the prosecutor argued that a protective order was required to keep the witnesses' identities secret—including from Mr. Baker—so that no one seeking to harm them would discover that they would be moved. (*Id.* 28:19–29:17.) The prosecutor did not assert and had no reason to believe that Mr. Baker had anything to do with the supposed threats.

Next, the prosecutor revealed that a man named Osvaldo Vargas had told police that he "had seen three guys rob a Mexican on that morning and throw him down a flight of stairs." (*See id.* 28:20–25.) Since that time, Mr. Vargas had not visited the prosecutor at his office or returned his two phone calls, but there was no evidence that Mr. Vargas' absence had anything to do with threats or fears for his safety. (*See id.* 30:3–25.) And yet, without any more evidence than this, the prosecutor asserted that a protective order was justified on these grounds.

Without a word from Mr. Baker's attorney, the state court granted each application and prohibited counsel from disclosing any information from the hearing to Mr. Baker. (*See id.* 31:10–14.) Aside from being told that two protective orders were granted, Mr. Baker was told nothing of the effect of those orders or their factual basis. (*See id.* 31–33.)

## E.    Mr. Bruno Compounds His Failings Before Trial by Abandoning Mr. Baker at Sentencing

Mr. Baker was sentenced on May 12, 2010.[10] Prior to the sentencing hearing, Mr. Bruno was provided a copy of the Pre-Sentence Report (the "PSR"). (*See* Ex. C-5, Marshall Aff. Ex. E.) The PSR was littered with errors, but Mr. Bruno failed to correct any of them and also failed to conduct his own investigation or even share the PSR with Mr. Baker. (*See* Ex. C-6, Baker

---

[10] Just prior to Mr. Baker's trial, Mr. Bruno had surgery for a heart attack in March 2010. (*See* Ex. C-5, Marshall Aff. Ex. D.) Mr. Bruno passed away in May 2015.

Aff. ¶¶ 39–41.)  For example, the PSR stated that the defendant "caused the death of Ramiro Ramos-Luna, by throwing him down a flight of stairs," despite uncontroverted testimony that Mr. Allick, and not Mr. Baker, pushed Mr. Ramos-Luna down the stairs.  (*See* Ex. C-5, Marshall Aff. Ex. E, at 2; Trial Tr. I 384:4–22; Trial Tr. II 12:8–11.)  In addition, the PSR inexplicably stated that Mr. Baker was a member of The Bloods gang, even though Mr. Baker is not, and never has been, a member of any gang.  (*See id.* at 3; Ex. C-6, Baker Aff. ¶ 44.)  The prosecutor mentioned on the record that "[the People] had discussions with defense counsels, [and] there may be one or two slight inaccuracies as they were recounted by the probation report," but Mr. Bruno never mentioned or specified, let alone corrected, any errors for the court.  (*See* Sent. Tr. 3:19–5:12.)

The prosecutor's description of the case was similarly distorted.  Critically, he misleadingly claimed that the "responsibility for the death of the deceased is directly attributable to both defendants equally" (*id.* 4:18–19), when the evidence showed that only Mr. Allick was responsible for pushing Mr. Ramos-Luna to his death.  (*See* Trial Tr. I 384:4–22; Trial Tr. II 10:6–12:9.)  That erroneous characterization was egregious and demonstrably prejudicial.

After the prosecutor argued for the maximum possible sentence—one that would see Mr. Baker spend the rest of his life behind bars—the court provided Mr. Bruno an opportunity to speak on Mr. Baker's behalf.  (*See* Sent. Tr. 5:6–12.)  Mr. Bruno did not correct the errors in the prosecutor's description of the case or even explain that, despite what the PSR said, Mr. Baker was not the one to cause Mr. Ramos-Luna's death.  (*Id.*)  He presented no mitigating evidence, despite the significant evidence that existed, and that Mr. Baker was only a teenager at the time of the offense—much of it unknown to Mr. Bruno due to his failure to ever inquire about or investigate Mr. Baker's life circumstances.  (*See id.*; Ex C-6, Baker Aff. ¶¶ 4, 40–42, 46, 49.)

Mr. Bruno made no suggestion of his own as to an appropriate sentence, made no request for leniency, and made no response to the prosecutor's request for the maximum possible sentence. (*See id.* ¶¶ 39–50.) Instead, the entirety of Mr. Bruno's advocacy—in a case that carried a life sentence and where the range between the permissible minimum terms was an entire decade—was as follows:

> Your Honor, there is nothing I could add. You were present for the jury trial, you obviously paid very careful attention. I would be foolish to rehash any facts at this time.

(Sent. Tr. 5:8–11.) That is, Mr. Bruno did nothing.

Mr. Bruno not only failed to speak on Mr. Baker's behalf; he failed to explain to Mr. Baker that he could make his own statement and that it would be beneficial for him to do so. (*See* Ex. C-6, Baker Aff. ¶ 39.) And so, when the court asked if he wanted to make a statement, Mr. Baker was unprepared and unsure whether speaking would help or hurt him—especially since his counsel had just himself declined to speak. (*See id.* ¶ 50.) Though sincerely remorseful about Mr. Ramos-Luna's death, Mr. Baker did not express his feelings to the court, having yet again been left to make a crucial decision without any guidance or aid from counsel. (*See id.*)

## F.    Mr. Bruno Fails to Discover or Present Readily Available Mitigating Evidence

In preparation for trial and sentencing, Mr. Bruno never asked Mr. Baker any questions about his family or upbringing (*see* Ex. C-6, Baker Aff. ¶ 25), nor did he speak with Mr. Baker's mother, Lucinda Lewis, or any other family member about Mr. Baker's difficult childhood. (*See* Ex. C-7, Lewis Aff. ¶¶ 12, 23.) This failure is all the more stark because Mr. Baker was only seventeen years old at the time of the crime—a fact that Mr. Bruno had to have known. (*See* Ex. C-6, Baker Aff. ¶ 4.) Although Mr. Baker's mother took it upon herself to call Mr. Bruno several times, Mr. Bruno was never available and never returned her calls. (Ex. C-7, Lewis Aff. ¶ 4.)

Bizarrely, in the one conversation she did have with Mr. Bruno, he told her that a plea deal for Mr. Baker was not possible.  (*See id*. ¶¶ 5–6.)

Had Mr. Bruno conducted a reasonable investigation into Mr. Baker's family history and personal character—or even had he picked up the phone—Mr. Bruno would have learned that Mr. Baker's life story was colored in large part by physical and psychological abuse, neglect, poverty, and numerous other mitigating factors.  These factors could have—and should have—been presented during the sentencing proceeding.  (*See id*. ¶¶ 13–17; Ex. C-6, Baker Aff. ¶¶ 5–16, 40–42, 49.)

Mr. Baker's mother struggled financially and emotionally while raising Mr. Baker and his six siblings.  (*See* Ex. C-6, Baker Aff. ¶ 5; Ex. C-7, Lewis Aff. ¶ 13.)  Mr. Baker was shuffled in and out of domestic-violence shelters and foster homes for most of his childhood (*see* Ex. C-6, Baker Aff. ¶¶ 5, 6–8; Ex. C-7, Lewis Aff. ¶¶ 15–16), beginning at the age of five, when he was placed in foster care because of family court accusations that his mother burned his sister.  (*See* Ex. C-6, Baker Aff. ¶¶ 7–10.)  According to those family court records, a medical facility found burns on Mr. Baker as well as his sister.  (*See id.*)  Separated from his siblings, Mr. Baker was abused by his foster family—one foster family even forced him to sleep in a bug-infested pantry. (*Id.* ¶ 9; Ex. C-7, Lewis Aff. ¶ 17.)  The lasting effects of the abuse Mr. Baker suffered through his time in foster care have required counseling.  (Ex. C-6, Baker Aff. ¶ 9; Ex. C-7, Lewis Aff. ¶¶ 16–18.)

Tragically, life outside of foster care was not much better.  After Mr. Baker returned to his mother's home at the age of seven, he and his siblings were physically and psychologically abused by his father, who had a history of substance abuse.  (*See* Ex. C-6, Baker Aff. ¶ 6; Ex. C-7, Lewis Aff. ¶ 14.)  And then, when Mr. Baker was twelve years old, his father left the family

13

altogether (*see* Ex. C-7, Lewis Aff. ¶ 14), thereafter visiting only infrequently and providing no financial support.  (*See* Ex. C-6, Baker Aff. ¶¶ 11–12; Ex. C-7, Lewis Aff. ¶ 14.)  Mr. Baker spent the rest of his childhood and early teen years living in shelters and bouncing between at least ten different schools.  (*See* Ex. C-6, Baker Aff. ¶¶ 11, 13–16; Ex. C-7, Lewis Aff. ¶ 14.)

Knowing nothing about Mr. Baker or the hardships that he had lived through—a story replete with mitigating factors—and with a PSR riddled with damaging errors, the court sentenced Mr. Baker to an indeterminate sentence of twenty years to life.  (*See* Sent. Tr. 5–6.)

**G.    The Trial Court Unreasonably Denies Mr. Baker's Challenge to His Judgment of Conviction and Sentence**

On April 15, 2014, Mr. Baker filed a motion under N.Y. Criminal Procedure Law § 440 to vacate his judgment of conviction because it was obtained in violation of his rights under the United States Constitution.  (*See* Ex. C); *see* N.Y. Criminal Procedure Law § 440.10(1).  The trial court denied Mr. Baker's motion in its entirety—without a hearing—in an opinion dated September 3, 2014.  (*See* Ex. C-1, Trial Ct. Op.)  Inappropriately aggregating the various aspects of Mr. Bruno's representation, rather than evaluating the specific, egregious instances of incompetence that prejudiced Mr. Baker, the trial court somehow found that a "review of the trial record in this case establishes that counsel zealously and competently represented defendant during the trial."  (*See id.* at 5.)

With respect to Mr. Baker's specific claims, the trial court held that Mr. Baker's claim of ineffective assistance at the plea stage was contradicted by the record because *Mr. Bruno* replied "I have" when asked whether or not he discussed the plea offer with his client.  (*See id.* at 6.) The trial court also misunderstood Mr. Baker's claim to be that Mr. Bruno "failed to persuade him to accept the plea offer" (*id.*), when Mr. Baker's claim was and is based on Mr. Bruno's failure to advise.  Mr. Baker's claim has never been that Mr. Bruno had an obligation to require

him to take the plea.  Mr. Baker's claim has always been that Mr. Bruno had an obligation to advise him about the adequacy of the plea offer in light of the governing law, his prospects at trial, and his sentencing exposure, so that Mr. Baker could make a knowing and informed decision with the assistance of competent counsel.

As to Mr. Baker's claim of ineffective assistance of counsel at sentencing, the trial court inexplicably excused Mr. Bruno's failure to advocate on Mr. Baker's behalf after concluding that "there were no mitigating circumstances" to discover.  (*See id.* at 9.)  Perversely, the court relied on only Mr. Bruno's prejudicial statement that "[t]here is nothing I could add" as evidence of there being no mitigating evidence.  (*See id.*)  That circular reasoning allowed Mr. Bruno's incompetence to justify itself.

## H.    The Appellate Division Unreasonably Denies Mr. Baker's Appeal of His Judgment of Conviction and Sentence

On February 2, 2015, Justice David Friedman granted Mr. Baker leave to appeal the denial of his § 440 motion, and on February 17, 2015, Mr. Baker filed a timely notice of appeal. (*See* Ex. B.)  In his appeal,[11] Mr. Baker raised a number of claims under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution, including (1) denial of his right to counsel for failure to address Mr. Baker's motion for new counsel, (2) ineffective assistance of counsel at the plea stage, (3) ineffective assistance of counsel at the sentencing stage, and (4) denial of his right to be present at a critical proceeding.  (*See id.*)

On May 26, 2016, the Appellate Division, First Department affirmed Mr. Baker's conviction, inexplicably finding that "[i]n all respects, defendant received effective assistance of

---

[11] In accordance with Justice Friedman's grant of leave, Mr. Baker filed a consolidated appeal from the (1) judgment of conviction rendered on April 20, 2010 by the Supreme Court, Bronx County (Michael Gross, J.); and (2) order entered on September 3, 2014, denying the § 440 motion to vacate the judgment of conviction.  That is, Mr. Baker was authorized to, and did, appeal his conviction and sentence, and the denial of his § 440 motion in one consolidated appeal.

counsel under the state and federal standards." (*See* Ex. B-1 at 10.) Specifically, the First

Department held as follows:

- ***Motion for New Counsel.*** The First Department found that Mr. Baker "abandoned his pro se motion for assignment of new counsel . . . by failing to call the court's attention to the fact that the existing motion remained unresolved." (*Id.* at 10.) The court also found that the form motion did not contain specific factual allegations serious enough to trigger the court's obligation to "make a minimal inquiry." (*Id.*)

- ***Ineffective Assistance of Counsel at Plea Bargaining.*** In a single sentence, the First Department dismissed Mr. Baker's affidavit and the allegations made therein as "inconsistent with the trial record, self-contradictory, uncorroborated by any other evidence, and otherwise without merit." (*Id.* at 11.)

- ***Ineffective Assistance of Counsel at Sentencing.*** Emphasizing that Mr. Baker received a less than maximum sentence and the "heinous facts of the crime," the First Department held that Mr. Baker failed to show "that the additional steps he faults his counsel for omitting could have led to even greater leniency." (*Id.* at 11.)

- ***Right to Presence.*** The First Department held that the trial court did not violate Mr. Baker's right to be present by at a material stage of trial by excluding him from the April 6 Hearing about the prosecution's request for witness protective orders because his attorney was present and because Mr. Baker did not show that his presence would have been useful. (*Id.* at 9.) The First Department also found that concerns for witness safety outweighed Mr. Baker's constitutional right. (*See id.* at 9–10.)

As will become clear, the First Department's cursory decision is specious.

On October 24, 2016, the New York Court of Appeals denied Mr. Baker leave to appeal.

(Ex. A-1.)

## **STANDARD OF REVIEW**

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court

shall "grant an application for a writ of habeas corpus based on an issue adjudicated on the

merits by a state court only if the state proceedings 'resulted in a decision that was contrary to,

or involved an unreasonable application of, clearly established Federal law, as determined by

the Supreme Court of the United States' or if they 'resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the state court

proceeding.'" *Evans v. Fischer*, 712 F.3d 125, 132 (2d Cir. 2013) (quoting 28 U.S.C. § 2254(d)(1)–(2)).  "The Supreme Court has instructed that section 2254(d)(1)'s 'contrary to' and 'unreasonable application of' clauses have independent meaning."  *Carmichael v. Chappius*, 848 F.3d 536, 544 (2d Cir. 2017).

A state court decision is "contrary to" Supreme Court precedent if the state court (1) "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's]."  *Williams v. Taylor*, 529 U.S. 362, 405 (2000).  Alternatively, a state court decision is an "unreasonable application of" federal law if it fails to properly "apply the rules 'squarely established' by [the Supreme] Court's holdings to the facts of each case."[12]  *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).  However, section 2254(d)(1) does not "require[] an identical factual pattern before a legal rule must be applied."  *Woodall*, 134 S. Ct. at 1706 (internal quotations omitted).  The relevant inquiry is whether the state court opinion rests on "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* at 1702 (internal quotations omitted).

---

[12] This Court may also look to decisions of the Circuit and District courts for guidance.  "Although AEDPA looks to Supreme Court precedent in its reference to "clearly established federal law," . . . federal habeas courts are not precluded from considering the decisions of inferior federal courts, as helpful amplifications of Supreme Court precedent, in evaluating whether the state court's application of the law was reasonable."  *Shiwlochan v. Portuondo*, 345 F. Supp. 2d 242, 263 (E.D.N.Y. 2004), *aff'd*, 150 F. App'x 58 (2d Cir. 2005) (internal quotations omitted).

<u>**ARGUMENT**</u>

**I.    MR. BAKER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO COUNSEL**
      **WHEN THE TRIAL COURT IGNORED HIS MOTION FOR NEW COUNSEL**

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of

counsel.  *See* U.S. Const. Amend. VI.  That right extends to indigent criminal defendants with

appointed counsel, who equally enjoy the "right to adequate representation," *Caplin & Drysdale,*

*Chartered v. United States*, 491 U.S. 617, 624 (1989), including "by appointed counsel, which

can be jeopardized if the attorney-client relationship is bad enough." *Lewis v. McGinnis*, No.

904-CV-32, 2008 WL 833964, at *14 (N.D.N.Y. Mar. 27, 2008) (citations and internal

quotations omitted).  That right is infringed upon, and substitution of counsel is warranted,

where "a complete breakdown of communication" prevents an adequate defense.  *See Lopez v.*

*Graham*, No. 10-CV-0468, 2012 WL 1865502, at *6 (E.D.N.Y. 2012) (quoting *McKee v. Harris*,

649 F.2d 927, 931 (2d Cir. 1981)).

When reviewing on habeas a state court's denial of a motion for new counsel, courts have

found the following four-factor test instructive: "(1) whether defendant made a timely motion

requesting new counsel; (2) whether the trial court adequately inquired into the matter; (3)

whether the conflict between the defendant and his attorney was so great that it resulted in a total

lack of communication preventing an adequate defense; and (4) whether the defendant

substantially and unjustifiably contributed to the breakdown in communication." *Id.* (quoting

*United States v. John Doe # 1,* 272 F.3d 116, 122–23 (2d Cir. 2001) (internal quotation marks

omitted)).  Here, the state court failed to apply anything approximating this standard.  Even if it

had applied the correct law, all four factors favor Mr. Baker so strongly that denial of his motion

for new counsel was unreasonable.

Of course, the trial court did not merely fail to rule reasonably on the motion for new counsel—it failed to rule on or address the motion at all, after failing to conduct any inquiry into Mr. Baker's complaints.  On direct appeal, the state appellate court unreasonably countenanced these failures by finding that (i) Mr. Baker had abandoned his motion and (ii) his form motion failed to raise specific allegations that would trigger even a minimal inquiry.  Neither of those findings square with established federal law, which courts in this Circuit have applied on habeas.

 As to the first finding, "[a] waiver of a constitutional right must be voluntary, knowing[,] and intelligent," and "[n]othing in the record suggests that [Mr. Baker] knowingly abandoned his motion for reassignment."  *Lopez*, 2012 WL 1865502, at *7.  To the contrary, [h]aving made his motion in [November 2008, Mr. Baker] was entitled to assume that the court would rule on it, and had no obligation to remind the court about a motion that he fairly assumed was pending."  *Id.*

Second, Mr. Baker's form motion for new counsel presented sufficiently substantial complaints to trigger a minimal duty of inquiry (*see* Ex. C-5, Marshall Aff. Ex. C), which the state court failed to satisfy by asking Mr. Baker or his counsel to voice his complaints.  *See Lopez*, 2012 WL 1865502, at *7 (finding that a New York form motion for new counsel triggered the state court's duty to review the motion and give the defendant a "full opportunity to explain its basis").  As part of that minimal inquiry, the state court was required to provide Mr. Baker an opportunity to explain the specific factual basis of his motion *precisely because* his motion was a form motion that might not have provided the court with sufficient information to make a reasoned decision on its own.  *See McKee*, 649 F.2d 927, 934 ("If the reasons [for new counsel] are made known to the court, the court may rule without more.  If no reasons are stated, the court then has a duty to inquire into the basis for the client's objection to counsel . . . .");  *see*

*also Lopez*, 2012 WL 1865502, at *9 (duty of inquiry required court to allow defendant an opportunity to explain basis of complaint where form motion consisted of check-box complaints).

Here, Mr. Baker was entitled to a ruling on his motion for new counsel after a suitable (if minimal) inquiry into his substantial complaints. The trial court's unexplained failure to address Mr. Baker's motion for new counsel and the appellate court's perfunctory analysis were constitutionally unreasonable.

### A.    Mr. Baker's Motion for New Counsel Was Timely

Mr. Baker timely filed his motion for new counsel nearly a year and a half before his trial. "That was [plenty] early enough to prevent significant interruption to [Mr. Baker's] trial proceedings," and as such, the first *John Doe* factor weighs in his favor. *See Lopez*, 2012 WL 1865502, at *7. Yet, in all that time, the trial court never addressed it.

At the risk of stating the obvious, Mr. Baker "cannot be faulted for the delay in resolving his motion." *Id.* (motion timely when filed six-months before trial). As here, the state court in *Lopez* found that the defendant had abandoned his application for new counsel or waived the right by failing to make any further complaint about his representation despite several in-court appearances for various pre-trial hearings. *See id.* On federal habeas, the district court found that "to the extent that the state court concluded that it did not need to resolve [the defendant's] motion prior to trial because [the defendant] had abandoned it, that determination was an unreasonable application of clearly established federal law." *Id.* So too here—nothing suggests that Mr. Baker knowingly abandoned or waived his motion. The state court's opposite holding was an unreasonable application of clearly established federal law.

### B.    The State Court Failed to Conduct Any Inquiry

Where a trial court "refuses to inquire into a seemingly substantial complaint about counsel when [it] has no reason to suspect the bona fides of the defendant, . . . the defendant may

then properly claim denial of his Sixth Amendment right." *United States v. Calabro*, 467 F.2d 973, 986 (2d Cir. 1972); *see also Brown v. Griffin*, No. 13-cv-1352, 2016 WL 4382668, at *12 (S.D.N.Y. 2016) ("A court should, of course, inquire into the reasons a defendant is dissatisfied with his current counsel before denying a request for substitution, unless those reasons are apparent.").  That rule applies with equal force when a defendant files a pro se motion for new counsel by submitting the very form designated for that purpose—any other result would amount to a constitutionally defunct bait-and-switch.

In *Lopez*, the defendant submitted his request for new counsel on a "pre-typed form affidavit" just like Mr. Baker's, and even checked many of the same boxes, indicating that counsel failed to (1) visit him at his place of confinement or otherwise consult him, (2) provide copies and inform defendant of any motions filed, and (3) forward copies of, among other things, any discovery in counsel's possession.  *See Lopez*, 2012 WL 1865502, at *8.  (*See also* Ex. C-5, Marshall Aff. Ex. C.)  But, unlike in Mr. Baker's case, the state court in *Lopez* provided the defendant an opportunity explain the basis for the complaints in his affidavit before ruling on the motion.  *See Lopez*, 2012 WL 1865502, at *8.  Only having given the defendant "a full opportunity to explain its basis," was the state court "entitled to rule on [the] motion without further inquiry."  *Id.* at *9; *see also*, *McKee*, 649 F.2d at 934 (holding that only where the reasons for the motion for new counsel are made known, may the court rule without more); *Shorter v. Corcoran*, No. 05-CV-0417, 2009 WL 3165608, at *5 (W.D.N.Y. Sept. 28, 2009) (trial court conducted adequate inquiry where it "permit[ed] Petitioner to explain his motion on the record").  Just the opposite is true here: having failed to give Mr. Baker a full opportunity to explain the factual predicates of his form motion, the court was *not* entitled to rule on the motion without  inquiry.

**C.    Mr. Bruno's Lack of Communication Amounted to a Breakdown of the Attorney-Client Relationship**

At the time he filed the motion, Mr. Baker's proffered reasons for dissatisfaction were substantial: Mr. Bruno had not answered any of Mr. Baker's repeated calls, nor had he provided any documents or information related to the case, some of which Mr. Baker explicitly requested. (Ex. C-6, Baker Aff ¶ 23; *see also*, Ex. C-5, Marshall Aff. Ex. C.)  As described, *infra* Parts II and III, Mr. Bruno's failures to provide any legal advice or advocacy persisted at both the pre-trial and sentencing stages and together reveal a complete breakdown of the attorney-client relationship.  Mr. Baker was deprived of his constitutional right to effective assistance of counsel, and therefore, the court's failure to inquire into his motion for new counsel was far from harmless.[13]

\* \* \*

The trial court's inaction set Mr. Baker's case on the constitutionally troubled course set out below, which could have been avoided had Mr. Baker's motion for new counsel been heard, as was constitutionally required.  For this failure alone, Mr. Baker asks that his conviction be vacated.

**II.    MR. BRUNO'S INCOMPETENCE DENIED MR. BAKER HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE PLEA STAGE**

In *Strickland v. Washington*, 466 U.S. 699 (1984), the Supreme Court made explicit that the Sixth Amendment to the U.S. Constitution guarantees the right to effective assistance of counsel.  *Id.* at 685–86.  The right to effective assistance of counsel is necessary "to protect the fundamental right to a fair trial" and is "critical to the ability of the adversarial system to produce just results."  *Id.* at 684–85.  Under *Strickland*, an ineffective assistance of counsel claim is gauged under a two-prong test:

---

[13] The fourth *John Doe* factor also weights in Mr. Baker's favor, as there is no indication whatsoever that Mr. Baker substantially and unjustifiably contributed to the breakdown in communication.

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687. The state appellate court's denial of Mr. Baker's claims of ineffective assistance of counsel at the plea-bargaining stage of his trial was contrary to and an unreasonable application of the Supreme Court's decision in *Strickland* and numerous decisions of this Circuit.

### A.    The *Strickland* Standard Applies to Claims of Ineffective Assistance at the Plea-Bargaining Stage

It is beyond dispute that Mr. Baker's Sixth Amendment right to counsel attaches with full force at the plea-bargaining stage. *See United States v. Gordon*, 156 F.3d 376, 379 (2d Cir. 1998) (holding that the right "attaches at all critical stages in the proceedings after the initiation of formal charges, which has been held to include plea negotiations" (citations and internal quotations omitted)). As such, the *Strickland* standard applies equally to ineffective assistance claims arising out of the plea process. *See Hill v. Lockhart*, 474 U.S. 52, 57 (1985) (holding that "the same two-part standard [in *Strickland* is] applicable to ineffective-assistance claims arising out of the plea process"). As a corollary to this right, "defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Missouri v. Frye*, 566 U.S. 134, 145 (2012). Indeed, given the ever-increasing importance (even primacy) of plea bargaining, not even a subsequent fair trial may cure "deficient performance by defense counsel during plea bargaining" *Lafler v. Cooper*, 566 U.S. 156, 169 (2012).

The Second Circuit has further held that the "strong presumption" of counsel's reasonableness under *Strickland* does not apply to claims arising out of the plea process. *See*

*Boria v. Keane*, 99 F.3d 492, 498 (2d Cir. 1996), *decision clarified on reh'g*, 90 F.3d 36 (2d Cir. 1996).  As the *Boria* court explained, the "strong presumption" in *Strickland* was meant to "protect lawyers from having strategic decisions judged with the distorting effects of hindsight," whereas the failure to provide adequate professional advice on a plea offer presents no such concern.  *Boria*, 99 F.3d at 498 (explaining that counsel was not confronted with a "strategic decision" in deciding whether to offer advice on a plea offer to his client (internal quotations omitted)).

Indeed, the single most important decision that Mr. Baker had to make in his criminal case was whether to accept a plea offer.  *See Boria*, 99 F.3d at 496–97 ("The decision whether to plead guilty or contest a criminal charge is ordinarily the most important single decision in any criminal case." (quoting Anthony G. Amsterdam, *Trial Manual 5 of the Defense of Criminal Cases*)).  At this critical moment, Mr. Baker's right to counsel entitled him to adequate advice and counsel regarding (1) "the advantages and disadvantages of the plea agreement," *Padilla v. Kentucky*, 130 S. Ct. 1473, 1484 (2010), and (2) "the comparative sentence exposure between standing trial and accepting a plea offer," *Gordon*, 156 F.3d at 380 (internal quotations omitted).  As explained more fully below, Mr. Baker did not receive any such advice from Mr. Bruno and suffered grave prejudice as a result.

### B.  The State Court Unreasonably Applied *Strickland* and Its Progeny

To determine whether the state court applied the *Strickland* two-prong test in an objectively unreasonable manner, this Court "must find that there was some increment of incorrectness beyond error[,] but the increment need not be great."  *Davis v. Greiner*, 428 F.3d 81, 87-88 (2d Cir. 2005) (internal quotations omitted).

Shirking a thorough constitutional analysis, the First Department dismissed Mr. Baker's claim out of hand by characterizing his affidavit as "inconsistent with the trial record, self-

contradictory, [and] uncorroborated." (*See* Ex. B-1 at 10–11.) But as discussed below, this was

an unreasonable characterization. For one, the fact that Mr. Bruno stated on the record that he

had conveyed the plea offer to Mr. Baker is consistent with Mr. Baker's claim, which is based on

Mr. Bruno doing nothing *more* than relaying the fact of the offer. Moreover, Mr. Baker's

affidavit is corroborated by the affidavit of his mother, Ms. Lewis. (*See* Ex. C-7, Lewis Aff. ¶¶

7–9.) The state, on the other hand, has not identified any admissible evidence to the contrary.

Furthermore, to the extent the First Department eschewed an analysis under *Strickland* by

relying on the trial court's surmise that Mr. Baker's rejection of the plea was nonetheless

knowing and voluntary (*see* Ex. C-1, Trial Ct. Op. at 6 ("Thus, the record clearly establishes that

defendant knowingly rejected the plea offer.")), the state court's decision is on its face contrary

to federal law. "An inquiry into whether the rejection of a plea is knowing and voluntary . . . is

not the correct means by which to address a claim of ineffective assistance of counsel." *Lafler*,

566 U.S. at 173. Although the First Department's decision cites *Strickland*, its short-shrift

analysis coupled with the trial court's misplaced assessment that Mr. Baker's rejection of the

plea was knowing and voluntary, suggest that it applied *Strickland* in name only.

To the extent that the First Department applied *Strickland* at all, it did so unreasonably.

### 1.    *Mr. Bruno's Advice—or Lack Thereof—Regarding the Plea Offer Was Deficient*

Deficient performance occurs where counsel's conduct falls "below an objective standard

of reasonableness" when judged against "prevailing professional norms." *Strickland*, 466 U.S. at

688. "Prevailing professional norms," as reflected in the American Bar Association standards,

are "guides to determining what is reasonable." *Id.* Although the law presumes that "counsel's

conduct falls within the wide range of reasonable professional assistance," *id.* at 689, attorney

errors that fall below an objective standard of reasonableness include "omissions that cannot be

explained convincingly as resulting from a sound trial strategy, but instead arose from oversight, carelessness, ineptitude, or laziness," *Wilson v. Mazzuca*, 570 F.3d 490, 502 (2d Cir. 2009) (internal quotations omitted).

Here, Mr. Bruno's failure to convey basic, but essential, information regarding the plea offer falls well below the "objective standard of reasonableness" under the Sixth Amendment. *See Strickland*, 466 U.S. at 688. Mr. Bruno first told Mr. Baker about the terms of the plea offer during a pretrial hearing, just minutes before the trial court asked Mr. Baker if he would accept the plea. (*See* Ex. C-6, Baker Aff. ¶¶ 28–29.) In this brief moment, Mr. Bruno did not provide Mr. Baker with any advice whatsoever regarding the plea. Mr. Bruno did not explain the felony-murder rule—a legal concept that a teenager lacking a high school education had no way of grasping on his own—or the import of that rule: that Mr. Baker could be convicted of murder regardless of the fact that he was not physically involved in the fatal act. (*See id.* ¶¶ 17, 38.)

Nor did Mr. Bruno explain the difference between determinate and indeterminate sentences. (*See id.* ¶ 31.) That the plea offer involved a determinate sentence was arguably its most significant and beneficial feature. The prosecution's plea offer carried a 14-year determinate sentence, whereas Mr. Baker faced the possibility of an indeterminate sentence of twenty-five years to life at trial. With only minutes to make a decision and receiving no advice as to the risk of conviction for felony-murder and no advice regarding the potential sentences he faced with and without the plea, Mr. Baker rejected the plea offer without any counsel from Mr. Bruno.[14] (*See id.* ¶ 34; Jan. 13, 2010 Hearing Tr. 10:10–12:17.)

---

[14] The fact that Mr. Bruno, now deceased, claimed previously that he "properly advised Mr. Baker regarding his potential sentence exposure at trial and his plea offer" does not—and cannot—refute the facts established by Mr. Baker. (*See* Ex. C-5, Marshall Aff. ¶ 39.) First, this conclusory hearsay statement does not set forth facts sufficient to show that Mr. Bruno ever explained, among other things, (1) the felony-murder rule; (2) the advantages and disadvantages of the plea offer; or (3) the sentence disparity between the plea offer and the range of sentences for the charge against Mr. Baker. *Cf. Carrion*, 644 F. Supp. 2d at 459–62 (finding that the state court unreasonably applied *Strickland* in denying petitioner's § 440.10 motion where petitioner's counsel could only

This Court confronted similar facts in *Carrion v. Smith*, 644 F. Supp. 2d 452 (S.D.N.Y. 2009), *aff'd*, 365 F. App'x 278 (2d Cir. 2010). There, petitioner refused a plea offer for a sentence of 10 years to life in prison and was subsequently convicted and sentenced to an indeterminate prison term of 125 years to life in connection with his purchase of cocaine and later shootout with the police. *Id.* at 455. Petitioner testified that his counsel: (1) discussed the plea deal with petitioner only once; (2) never informed him of the maximum sentence or mandatory minimums; (3) never informed him of his likelihood of success; but (4) advised petitioner that the plea was a "good offer." *Id.* at 458–62. Because "(1) [counsel] failed to advise [petitioner] of the sentencing exposure he faced if he were convicted at trial; and (2) he failed to give [petitioner] advice regarding the advisability of accepting the plea offer that was sufficiently robust under the circumstances," the *Carrion* court found that petitioner met the first prong of *Strickland*, and that the state court had unreasonably applied federal law in holding that petitioner received effective assistance of counsel. *Id.* at 467.

As in *Carrion*, the state court here unreasonably applied *Strickland* in holding that Mr. Baker received effective assistance of counsel. Like *Carrion*'s counsel, Mr. Baker's did not inform him of his maximum potential sentence. Mr. Bruno's failure to do so was in clear derogation of his "duty to inform his client of the sentencing exposure he face[d] if he accept[ted] the plea offer and if he [did] not." *Carrion*, 644 F. Supp. 2d at 467. Furthermore, the *Carrion* court found that counsel's "one conversation with [petitioner] in which he described the

---

testify that it was his "standard practice" to advise his clients about relevant sentencing guidelines but not to provide advice about whether to accept a plea offer).

Second, it was unreasonable for the 440.10 court to rely on Mr. Bruno's out-of-court statement in order to refute the facts set forth by Mr. Baker. Rather, it was required to hold an evidentiary hearing. *See* N.Y. C.P.L. § 440.30(5); *People v. Hill*, 979 N.Y.S.2d 737, 1169–70 (4th Dep't 2014) (reversing trial court decision denying a § 440.10 motion without a hearing where defendant averred that his counsel had not adequately advised him regarding a plea offer). It did not. For the state court to treat Mr. Bruno's statement as tantamount to the factual record only highlights its unreasonable application of the deficient-performance prong of *Strickland*.

proposed plea as a 'good offer'" was "tantamount to the absence of counsel"—here, Mr. Baker's counsel had one conversation with Mr. Baker in which he provided *no* characterization of the offer at all. *Carrion*, 644 F. Supp. 2d at 468. That *is* the absence of counsel.

### 2.    Mr. Bruno's Lack of Counsel Caused Mr. Baker to Reject the Plea Offer, Which He Otherwise Would Have Taken

To establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In assessing prejudice, courts do not examine every deficient act or omission in isolation, but rather in the context of the case as a whole. *See id.* at 695–96. The courts of this Circuit have found ineffective assistance where counsel's various acts and omissions together prejudiced the defendant. *See, e.g.*, *Shiwlochan*, 345 F. Supp. 2d at 263 (finding ineffective assistance where counsel did not inform petitioner of the government's plea offer and did not discuss petitioner's maximum sentencing exposure).

Prejudice in the plea bargaining context is satisfied where a defendant shows "but for counsel's deficient performance there is a reasonable probability he and the trial court would have accepted the guilty plea." *Lafler*, 566 U.S. at 174. Prejudice may also be shown "if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence." *Id.* at 1387 (internal citations and quotations omitted); *see also Gordon*, 156 F.3d at 376 (establishing prejudice based on a large disparity between plea and trial sentences together with defendant's sworn statements that he would have taken the plea had he been provide effective assistance of counsel); *Pham v. U.S.*, 317 F.3d 178, 182-83 (2d Cir. 2003) (same based on 113-month disparity).

Here, Mr. Baker did not know any information essential to his decision of whether to accept the plea offer. Mr. Baker did not understand the felony-murder rule. (*See* Ex. C-6, Baker Aff. ¶ 17.) He did not know the length of the sentence he could face at trial or the difference between determinate or indeterminate sentences. (*Id.* ¶¶ 19, 38.) He did not understand or appreciate that there was a strong likelihood of conviction at trial: the prosecution possessed a video tape of the incident, there were multiple witnesses who would identify Mr. Baker as a participant in the incident, and one of Mr. Baker's codefendants had inculpated Mr. Baker during a plea allocution. (*See id.* ¶ 19–20.) It was the job of Mr. Baker's counsel to educate and advise him on all of this.

Had Mr. Baker known any of this information, he would have accepted the plea offer. (*See id.* ¶ 34.) Not only has Mr. Baker sworn an affidavit to this effect; his willingness to do so is buttressed by his past conduct. He previously accepted a plea for a robbery charge after his attorney in that case—unlike Mr. Bruno—effectively explained the charges, the mechanics of the sentence, and Mr. Baker's chances of success at trial. (*See id.* ¶ 30.)

Mr. Baker's claim for ineffective assistance of counsel further meets *Strickland*'s prejudice prong because the disparity between fourteen years and life in prison is extreme and Mr. Baker has credibly maintained that he would have accepted the plea offer had he been properly informed. *See Carrion*, 644 F. Supp. 2d at 468. Because there is "prejudice beyond dispute that had [petitioner] been properly counseled, he might well have accepted the plea offer and received a much shorter sentence," the state court unreasonably applied *Strickland* in denying Mr. Baker's motion. *See Carrion*, 644 F. Supp. 2d at 473.

The errors committed by Mr. Baker's counsel at the plea-bargaining stage amount to a clear violation of his Sixth Amendment right to counsel. There is a reasonable probability that,

in the absence of these errors, Mr. Baker would have accepted the plea. *See Lafler*, 566 U.S. at

174. Thus, Mr. Baker requests that this Court vacate his judgment of conviction.

### C.    Alternatively, Mr. Baker Is Entitled to the Benefit of the Rejected Plea Offer

Having made out his claim for ineffective assistance of counsel at the plea stage, Mr.

Baker is entitled to the benefit of the plea offer that he rejected on account of that constitutional

ineffectiveness. This Court has "considerable discretion in fashioning a remedy" in light of the

Sixth Amendment violation, *Carrion v. Smith*, 365 F. App'x 278, 284 (2d Cir. 2010) (quoting

*United States v. Day*, 969 F.2d 39, 47 (3d Cir. 1992)), and "where there has been a finding of

ineffective assistance of counsel in a [habeas] proceeding, the remedy 'should be tailored to the

injury suffered from the constitutional violation." *Gordon*, 156 F.3d at 381 (quoting *United

States v. Morrison*, 449 U.S. 361, 364 (1981)). Put differently, "[t]hat remedy is one that as

much as possible restores the defendant to the circumstances that would have existed had there

been no constitutional error." *Carrion*, 365 F. App'x at 284.

Here, the remedy that most closely restores Mr. Baker to the place he would be absent

Mr. Bruno's constitutional error is to provide him the benefit of the plea offer. But for his

constitutional deprivation, Mr. Baker would have pleaded guilty to manslaughter and a

determinate sentence of fourteen years with five years of post-release supervision. That is what

he is entitled to now. *Id.* (affirming district court's remedy of vacating convictions not

encompassed in plea offer and reducing sentence to the term offered as a part of the rejected plea).

Thus, if this Court does not vacate his conviction and sentence entirely, this Court should

vacate Mr. Baker's second-degree murder conviction and sentence, and enter a conviction of

manslaughter and determinate fourteen-year sentence, with credit for time served since January

13, 2010, the date on which Mr. Baker would have accepted the plea offer. (*See* Jan. 13, 2010

Hearing Tr. I 10–12.)

III.   **MR. BRUNO'S ABANDONMENT OF MR. BAKER AT SENTENCING DENIED MR. BAKER HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL**

It is axiomatic that a defendant's Sixth Amendment right to "effective assistance from his attorney at all critical stages in the proceeding" extends to sentencing. *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013) (citing *Glover v. United States*, 531 U.S. 198, 202–04 (2001)); *see also Lafler v. Cooper*, 566 U.S. 156, 165 (2012) ("Even though sentencing does not concern the defendant's guilt or innocence, ineffective assistance of counsel during a sentencing hearing can result in *Strickland* prejudice . . . .").

In ordinary cases, ineffective assistance of counsel claims are judged under the familiar *Strickland* standard discussed above.  To succeed under that standard, a claimant must show (1) that counsel's performance was so deficient as to fall below an objective standard of reasonableness and (2) that the deficient performance prejudiced the defense—that is, a reasonable probability that the outcome of the proceeding would have been different but for the deficient performance.  *Strickland*, 466 U.S. at 687–88, 694.  But this is no ordinary case.

In certain rare cases—those involving the abject failure of counsel—the circumstances are "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified," and prejudice is presumed.  *United States v. Cronic*, 466 U.S. 648, 658 (1984); *see also Strickland*, 466 U.S. at 692 ("Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice.").  This is one of those cases.

A.   **The *Cronic* Presumption of Prejudice Is Appropriate Because Mr. Bruno Failed to Perform the Role of Advocate at Sentencing**

The Sixth Amendment's guarantee is "not merely the provision of counsel to the accused, but 'Assistance,'"; where no assistance is provided, the constitutional guarantee is violated. *Cronic*, 466 U.S. at 654.  To hold otherwise—that is, to hold that the mere presence of counsel

satisfies the constitutional guarantee—would be to "convert the appointment of counsel into a

sham." *Id.* (citing *Avery v. Alabama*, 308 U.S. 444, 446 (1940)).  Put differently, "the

adversarial process protected by the Sixth Amendment requires that the accused 'have counsel

acting in the role of an advocate'"—someone to challenge the government's case and to advocate

for mitigation and leniency.  *Id*. at 656 (citing *Anders v. California*, 386 U.S. 738, 743 (1967)).

Whether counsel is absent altogether or present but silent, "the effective abandonment of a

defendant at sentencing calls for the application of *Cronic*."  *Miller v. Martin*, 481 F.3d 468, 472

(7th Cir. 2007) (finding that defense counsel's advocacy at sentencing was so non-existent as to

fall within *Cronic*).[15]  Mr. Baker had no advocate at sentencing; his abandonment triggers *Cronic*.

        No amount of poetic license can recast Mr. Bruno's performance at sentencing as that of

an advocate.  Aside from showing up for court that day, Mr. Bruno did nothing: "he did not offer

a shred of mitigating evidence, object to (or consult with his client about) errors in the PSR, or

even lobby for a sentence lower than the one urged by the State."  *Miller*, 481 F.3d at 473; (*see*

Ex. C-6, Baker Aff. ¶¶ 39–41.)  Faced with nearly identical facts as these, the *Miller* Court found

that counsel's "advocacy at sentencing was so non-existent as to fall within even a very narrow

[*Cronic*] exception."  *Miller*, 481 F.3d at 473.  The facts here are even worse.  Not only did Mr.

Bruno replicate the failures in *Miller*; he made an affirmative statement against his client:

> Your Honor, there is nothing I could add.  You were present for the
> jury trial, you obviously paid very careful attention.  I would be
> foolish to rehash any facts at this time.

---

[15] Although these cases are (thankfully) rare on the facts, the law is well settled that the functional abandonment of counsel triggers *Cronic*.  *See, e.g.*, *Bell v. Cone*, 535 U.S. 685 (2002) ("attorney's failure must be complete" to apply); *United States v. Theodore*, 468 F.3d 52, 57 (1st Cir. 2006) (applies where errors are "tantamount to non-representation"); *United States v. White*, 341 F.3d 673, 679 (8th Cir. 2003) (where "counsel completely failed to participate in the proceedings"); *Jackson v. Johnson*, 150 F.3d 520, 525 (5th Cir. 1998) (where counsel "was not merely incompetent but inert").

(*See* Sent. Tr. 5.)[16]

In short, Mr. Bruno's abject failure at sentencing triggers *Cronic*, and prejudice may be presumed. The state appellate court failed to consider—let alone apply—*Cronic* and thus acted "contrary to" clearly established law by not using the appropriate standard. For this alone, Mr. Baker's sentence must be set aside. *See Bell v. Cone*, 535 U.S. 685, 646 (2002) (noting that federal habeas relief is appropriate under the "contrary to" prong "if the state court applies a rule different from the governing law set forth in [Supreme Court] cases"); *Francis S. v. Stone*, 221 F.3d 100, 108–09 (2d Cir. 2000) ("Thus, state court use of an incorrect legal standard can result in a decision 'contrary to' established Supreme Court law.").

**B.      Even if the *Strickland* Standard Governs, the State Court Unreasonably Denied Mr. Baker's Claim**

Although *Cronic* is the appropriate standard to account for the functional absence of Mr. Baker's counsel, application of *Strickland*'s two-pronged test demands the same conclusion— that Mr. Baker was prejudiced by his counsel's deficient performance at sentencing. For one, Mr. Bruno's complete abandonment of Mr. Baker falls far below "an objective standard of reasonableness" and therefore constitutes deficient performance. *Strickland*, 466 U.S. at 669. That core deficiency is only compounded by Mr. Bruno's failures to consult with Mr. Baker regarding sentencing strategy; advise Mr. Baker on his ability to make a statement on his own behalf; marshal or introduce even a scrap of the ample mitigating evidence; or review the PSR and discuss it with Mr. Baker.

---

[16] It should go without saying that Mr. Bruno's silence was not the product of any discernable strategy. Indeed, "[t]o hold that 'strategy' justified [Mr. Bruno's] decision would be to make a mockery of the word." *Miller*, 481 F.3d at 473.

So too has Mr. Baker shown "a reasonable probability that, but for counsel's substandard performance, he would have received a less severe sentence." *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013) (citing *Lafler v. Cooper*, 132 S. Ct. 1376, 1387 (2012)).  For defendants seeking habeas relief based on prejudice at the sentencing stage, the Constitution does "not require a . . . show[ing] 'that counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding, but rather . . . 'a probability sufficient to undermine confidence in [that] outcome.'"  *See Porter v. McCollum*, 558 U.S. 30, 44 (2009) (citing *Strickland*, 466 U.S. at 693–94).  Here, confidence has been eviscerated.

In short, Mr. Baker effectively had no counsel at sentencing; thus—even outside of *Cronic*—Mr. Baker need only proffer hypothetical sentencing arguments that are potentially effective in order to "show that the reasonable-probability standard with respect to the sentencing claim was met." *Gonzalez*, 722 F.3d at 136 (finding that hypothetical sentencing arguments proffered by defense counsel were sufficient to undermine confidence in the outcome).  Mr. Baker can point to several such arguments, which should have been made by counsel, but were not.  Mr. Bruno could have:

- emphasized Mr. Baker's limited physical role in the crime and complete lack of intent;

- drawn the court's attention to the several mitigating factors of Mr. Baker's upbringing;

- emphasized Mr. Baker's young age (17) at the time of the crime;

- expressed Mr. Baker's deep remorse and regret about what had happened;

- corrected the several damaging errors contained in the PSR; or

- advised Mr. Baker that it would be prudent for him to make a statement on his own behalf.

Instead, he did nothing.

Mr. Bruno's silence on these issues was deafening in the face of the prosecutor's arguments that Mr. Baker should receive the maximum sentence precisely because he had not accepted responsibility for his actions.  (*See* Sent. Tr. 4 ("this defendant should be isolated from open society for as long a period of time if he does not accept his responsibility").)  These facts make it impossible to have "confidence in the outcome" of Mr. Baker's sentencing proceeding. *Strickland*, 466 U.S. at 694.

### 1.    *Mr. Bruno's Performance at Sentencing Was Deficient*

There is no disputing that Mr. Bruno's performance was constitutionally deficient with regard to sentencing.  For the reasons given, Mr. Bruno's abandonment of his role as advocate is constitutionally defective on its face.  *See Cronic*, 466 U.S. at 656 ("[T]he adversarial process protected by the Sixth Amendment requires that the accused have 'counsel acting in the role of an advocate.'").  Mr. Bruno did nothing more than attend Mr. Baker's sentencing hearing, and certainly did not "'act independently of the Government [] to oppose it in adversary litigation,'" as he was required to do.  *Id.* (quoting *Ferri v. Ackerman*, 444 U.S. 193, 204 (1979)).  But Mr. Bruno's deficiencies run deeper.

For one, the Sixth Amendment requires that counsel "consult with the defendant on important decisions and . . . keep the defendant informed of important developments in the course of the prosecution."  *Strickland*, 466 U.S. at 688.  Mr. Bruno did nothing of the sort.  In the time between Mr. Baker's conviction and sentencing, Mr. Bruno did not once meet or speak with Mr. Baker about his upcoming sentencing.  (Ex. C-6, Baker Aff. ¶ 41); s*ee Gonzalez*, 722 F.3d at 135 (holding that it was constitutionally deficient for counsel not to see defendant after trial until just before sentencing).  This failure was crucial because it meant that Mr. Bruno never advised Mr. Baker that he should make a statement at sentencing to demonstrate his remorse and acceptance of responsibility—and certainly never helped him craft such a statement.  (Ex. C-6,

Baker Aff. ¶ 39.)  Flummoxed at the unexpected opportunity to speak in open court—having only just witnessed his own counsel refuse to speak—Mr. Baker declined the court's invitation and unknowingly sealed his own fate.  (*Id.* ¶ 50.)

Second, Mr. Bruno failed to perform the fundamental task of sharing the PSR with Mr. Baker and reviewing it for inaccuracies.  (*Id.* ¶¶ 43–45); *see Gonzalez*, 722 F.3d at 135 (finding deficient performance where defendant was forced to obtain PSR from probation officer rather than counsel, and where counsel spent only fifteen minutes discussing the PSR with defendant). This proved especially costly because, absent any advocacy on the part of Mr. Bruno, the error-laden PSR was the only information before the trial court apart from the prosecutor's misleading arguments requesting the maximum possible sentence.

Third, Mr. Bruno made no effort to investigate or introduce potential mitigating evidence (Ex. C-6, Baker Aff. ¶ 40), despite an unquestionable duty to do so.  *See Porter*, 558 U.S. at 39 ("counsel had an obligation to conduct a thorough investigation of the defendant's background" (internal citations omitted)); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (finding ineffective assistance of counsel where counsel failed to investigate beyond defendant's presentence report). Had Mr. Bruno bothered to review Mr. Baker's PSR, he would have been put on notice that substantial mitigating evidence existed—namely, that Mr. Baker  was "the product of a broken home," "resided in various shelters" throughout his childhood, and that "[h]is father ha[d] provided no financial or moral support."  (*See* Ex. C-5, Marshall Aff. Ex. E at 4.)  Under these circumstances, it "is undisputed that [Mr. Baker] had a right—indeed, a constitutionally protected right—to provide the [fact-finder] with the mitigating evidence that his trial counsel [] failed to discover."  *Williams v. Taylor*, 529 U.S. 362, 393 (2000).  Mr. Bruno never offered a

reason for his failure to investigate Mr. Baker's personal history, nor could a sufficient justification possibly exist.

Faced with indistinguishable facts in *Gonzalez*, the Second Circuit remarked, "[t]here is no dispute over whether [Counsel's] performance was deficient with regard to sentencing. It was." *Gonzalez*, 722 F.3d at 135. Like here, counsel in *Gonzalez* failed to meet with the defendant to prepare for sentencing, remained silent in response to the prosecution's sentencing recommendation, and uttered not a single word in favor of leniency, all after reviewing the PSR with defendant for only fifteen minutes—fifteen minutes longer than Mr. Bruno did here. *Id.* at 127. In both instances, counsel "did little more than simply attend [the defendant's] sentencing hearing." *Id.* at 136. *Gonzalez* and the Constitution point in the same direction: Mr. Bruno's performance was deficient.

### 2. *Mr. Bruno's Inadequate Performance Prejudiced Mr. Baker*

It was unreasonable for the state appellate court not to find that Mr. Baker has shown "a reasonable probability that, but for counsel's substandard performance, he would have received a less severe sentence." *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013) (citing *Lafler v. Cooper*, 132 S. Ct. 1376, 1387 (2012)).[17] The conceptual difficulty with "fathoming whether persuasive arguments could have been made been made on behalf of [Mr. Baker] is that [Mr. Bruno] did not act as an advocate for [Mr. Baker] at all." *Gonzalez*, 722 F.3d at 136. That is, it is difficult to catalog the universe of arguments that Mr. Bruno could have made on Mr. Baker's behalf had he met even the barest of his constitutional duties of representation, let alone to predict what affect those arguments may have had on the sentencing judge. But in the face of

---

[17] A reasonable probability of even a minimally less severe sentence is adequate prejudice to warrant relief under *Strickland* and its progeny. *See Glover v. United States*, 531 U.S. 198, 203 (2001) ("Authority does not suggest that a minimal amount of additional time in prison cannot constitute prejudice. Quite to the contrary, our jurisprudence suggests that any amount of actual jail time has Sixth Amendment significance.").

Mr. Bruno's abject abandonment, that conceptual burden is not Mr. Baker's to bear. Of the "hypothetical sentencing arguments" that Mr. Baker has set forth here, only some of them need be "potentially 'effective' arguments" to "undermine [the Court's] confidence in the outcome of [Mr. Baker's] original sentencing and thus [suffice] to show that the reasonable-probability standard with respect to the sentencing claim was met." *Id.* Mr. Baker has shown reasonable probability and then some.

The Appellate Division, First Department unreasonably applied these principles in determining that Mr. Baker, "who received a less than maximum sentence despite the heinous facts of the crime, has not shown that the additional steps he faults his counsel for omitting could have led to even greater leniency." (*See* Ex. B-1 at 11.) This, the single sentence devoted to Mr. Bruno's egregious incompetence at sentencing, cannot be squared with governing law—which requires only "potentially 'effective' [sentencing] arguments"—or the fact that Mr. Baker had several compelling sentencing arguments, none of which were raised.

There can be no serious doubt that Mr. Baker's proffered sentencing arguments could *potentially* have been effective, especially where each speaks directly to a consideration that the trial court expressly factored against Mr. Baker.

- ***First***, and perhaps most prejudicially, the trial court accepted the prosecutor's statement that "the victim's death was attributable to both defendants equally," (*see* Ex. C-1, Trial Ct. Op. at 9), when uncontroverted evidence made clear that Mr. Baker did not participate in the physical act that caused the victim's death. (*See* Trial Tr. I 384:4–22; Trial Tr. II 12:8–11.) This was especially damaging in light of the court's emotional revulsion to the crime, which it described as a "senseless" and "brutal killing." (*See* Ex. C-1, Trial Ct. Op. at 9.) Had Mr. Bruno opposed the prosecution's deceptive statement and corrected the court's culpability calculus, it is possible—if not probable—that the state court's sentencing decision would have been different. That the court oversaw the trial and *should have* been aware of the truth is of no consequence in light of the court's demonstrated unfamiliarity with the facts.

38

- ***Second***, the trial court mischaracterized Mr. Baker's failure to make a statement on his own behalf as evincing a lack of remorse or acceptance of responsibility. (*See* Ex. C-1, Trial Ct. Op. at 8–9.) But in reality, Mr. Baker was remorseful and did accept responsibility for his actions; only twenty years old at the time, he was merely unprepared to make an extemporaneous statement in open court, especially without knowing how the court might receive it. (*See* Ex. C-6, Baker Aff. ¶¶ 4, 50.) His silence, then, was a product only of Mr. Bruno's failure to advise him on his ability to make such a statement and the efficacy of doing so. (*See id.* ¶ 39.)

- ***Third***, the trial court mistook Mr. Bruno's silence at sentencing as proof that "[c]learly, there were no mitigating circumstances in the facts of the case." (*See* Ex. C-1, Trial Ct. Op. at 9.) As the record before this Court shows, nothing could be further from the truth. The substantial mitigating evidence that Mr. Bruno failed to uncover or bring to the trial court's attention unquestionably had the potential to be effective where that court was under the admitted misimpression that no such evidence existed.

In *Porter*, the Supreme Court found mitigation where the underlying crime involved a premeditated, cold-blood shooting of the defendant's ex-girlfriend and her new boyfriend, while the boyfriend attempted to protect her. *Porter*, 558 U.S. at 31–32. Despite the disturbing facts, the Court nevertheless found that counsel's failure to explore mitigating factors—a childhood filled with domestic abuse and a history of military service—justified relief on habeas. So too here, the facts of Mr. Baker's crime do not excuse his counsel's failures or preclude relief.

Moreover, at the time of the offense, Mr. Baker was not *Mr.* Baker—he was a seventeen-year-old boy, who, despite a hard, tumultuous life, had a very real capacity for rehabilitation. (*See* Ex.C-6, Baker Aff. ¶ 4.) It was Mr. Bruno's duty to show this to the trial court and to advocate on Mr. Baker's behalf in all of these ways and more. But the trial court was never given this input, and due to Mr. Bruno's silence, was all but forced to hand down a sentence based on uncontested inaccuracies and unchallenged assumptions—all of which were adverse to Mr. Baker. Had the trial court been presented with any of these potentially effective sentencing arguments, there is a very "reasonable probability" that Mr. Baker's sentence would have been less than the twenty years to life that he is unjustly serving today.

39

The Constitution demands that this Court vacate Mr. Baker's sentence and order that he be resentenced at a proceeding where he is adequately represented by counsel.

## IV.    THE STATE COURT DENIED MR. BAKER HIS CONSTITUTIONAL RIGHT TO PRESENCE BY UNREASONABLY EXCLUDING HIM FROM A MATERIAL PRE-TRIAL HEARING

A defendant's constitutional right to be present at all material stages of his trial is a fundamental, if simple, constitutional guarantee—one based on the core precept that justice is only ever just if dispensed out in the open, before the accused.  The right is a broad one, "guarantee[ing] to a criminal defendant . . . the right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings."  *Tennessee v. Lane*, 541 U.S. 509, 523 (2004).  So too it is well established and long protected.  *See e.g.*, *Lewis v .U.S.*, 146 U.S. 370, 372 (1892) ("A leading principle that pervades the entire law of criminal procedure is that, after indictment found, nothing shall be done in the absence of the prisoner."); *U.S. v. Fontanez*, 878 F.2d 33, 35 (2d Cir. 1989) (noting that it "has long been settled that an accused enjoys a right . . . to be present at all stages of trial").  The "right to presence," it has been said, "is 'scarcely less important to the accused than the right of trial itself.'"  *Grayton v. Ercole*, 691 F.3d 165, 170 (2d Cir. 2012) (quoting *Diaz v. United States*, 223 U.S. 442, 455 (1912)).

Indeed, the right to presence is so fundamental that it finds its roots in not one, but two, constitutional guarantees—the Due Process Clause of the Fifth Amendment and the Confrontation Clause of the Sixth.  *See Tennessee v. Lane*, 541 U.S. at 532 ("The Due Process Clause and the Confrontation Clause of the Sixth Amendment, as applied to the States via the Fourteenth Amendment, both guarantee to a criminal defendant . . . the 'right to be present.'" (quoting *Faretta v. California*, 422 U.S. 806, 819, n.15 (1975))).  Though a criminal defendant's right to be present exists independently under each, where, as here, a violation of the right

offends the guarantees of both Amendments, courts must defend it with even greater vigilance. This the state court failed to do.

The state appellate court found that Mr. Baker's right to presence was not violated for three reasons—none of which holds any water. For one, the court's intimation that the presence of Mr. Baker's attorney at the April 6 Hearing made up for Mr. Baker's own absence rings hollow. Setting the tragic irony of that claim aside, the Constitution guarantees "'the right to *personal* presence.'" *Grayton*, 691 F.3d at 172 ("there is no support for the government's suggestions that the presence of counsel is a substitute for the presence of the defendant himself" (quoting *Rushen v. Spain*, 464 U.S. 114, 117 (1983))). Second, the notion that Mr. Baker failed to show that "his presence would have been useful," (*See* Ex. B-1, App. Ct. Op. at 9), is belied by the undisputed fact that Mr. Baker was the only one to know the Coles personally and so was uniquely qualified to assess the Coles' motives during the hearing. Third, these vague, unsubstantiated assertions of witness protection cannot trump Mr. Baker's constitutional right.

### A.    The State Court Violated Mr. Baker's Constitutional Right to Be Present When It Barred Him from a Fact-Intensive Pre-Trial Hearing, thus Handicapping His Ability to Confront the Only Two Testifying Eyewitnesses Against Him [18]

As determined by the Supreme Court and the courts of this Circuit, it is—and has been for some time—clearly established that a criminal defendant has a constitutional right to be present "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge," so long as his presence would not be "useless, or the

---

[18] The prosecution also sought a protective order for a man named Osvaldo (later determined to be, Orlando) Vargas, who had reportedly told police that he witnessed the crime. As with the Coles, there was virtually no evidence that Mr. Vargas feared that anyone would harm him if he testified. Thus, Mr. Baker was similarly prejudiced by being kept unaware of Mr. Vargas' identity and possibly favorable testimony—because the prosecution never called Mr. Vargas to testify, there is no way to know what his testimony would have been. Had Mr. Baker not been excluded from the April 6 Hearing, however, he could have directed his attorney to interview Vargas to determine whether he could have supplied credible, exculpatory testimony.

benefit but a shadow." *Snyder v. Massachusetts*, 291 U.S. 97, 105–07 (1964).[19]  The right

attaches whenever there is some indication that a criminal defendant's presence would be useful

to ensure a more reliable hearing because of his knowledge of the facts or circumstances.

*Compare Kentucky v. Stincer*, 482 U.S. 730, 747 (1987) (no right to presence where "no

indication" that defendant's knowledge of the facts or background would have been useful or

that he would have gained anything by attending the hearing), *with Grayton*, 691 F.3d at 172

(right to be present at a pre-trial hearing where defendant was best equipped to answer factual

questions).  Thus, the more factual in nature a hearing, the stronger a defendant's right to be

present.  S*ee Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000) (indicating that "[i]f fact issues

are presented . . . it would seem that defendant has a right to be present" (quoting 3A Charles

Alan Wright, Federal Practice and Procedure § 721.1 at 12 (2d ed. 1982))); *People v. Dokes*, 79

N.Y.2d 656, 660 (N.Y. 1992) ("In determining whether a defendant has a right to be present

during a particular proceeding, a key factor is whether the proceeding involved factual matters

about which defendant might have peculiar knowledge that would be useful in advancing the

defendant's or counter the People's position.").

### 1.    *Mr. Baker Was Entitled to Be Present at The April 6 Hearing, which Involved Factual Matters with Which Mr. Baker Was Best Positioned to Meaningfully Assist*

All indications suggest that the April 6 Hearing was precisely the sort of fact-intensive

hearing that Mr. Baker was constitutionally entitled to attend.  *See*, *supra*, Statement of Facts at

D).  *See Kentucky v. Stincer*, 482 U.S. 730, 740 (1987) (noting that a hearing that "determines

whether a key witness will testify" is a stage of trial at which the right to presence can attach).

---

[19] It goes without saying that the "fact that the Supreme Court has never expressly extended the right to presence to a [protective order] hearing does not foreclose analysis under AEDPA.  Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt."  *Grayton*, 691 F.3d at 170 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)).

Mr. Baker had personal knowledge about the subject matter of the April 6 Hearing that no one in attendance shared. For one, Mr. Baker knew the Coles socially and had spent time at their house, uniquely positioning him—and not his counsel or anyone else in attendance—to gauge their willingness to lie in order to obtain new, potentially far better housing. *Cf. Grayton*, 691 F.3d at 172 (defendant had right to be present where "personally familiar with the witnesses and aware of any motive they might have to fabricate"). So too, Mr. Baker may have had useful information about the person named "Day-Day" and his alleged threats, which might have led the court to reject the prosecutor's application for a protective order. Even if he had no specific information as to the threats, Mr. Baker's personal knowledge of the Coles and the community would have enabled his counsel to question the veracity of the threats as the court determined whether to issue the protective orders. At the very least, Mr. Baker could have provided information demonstrating that he was not involved in any threat-making.

### 2. Mr. Baker's Exclusion Impaired His Right to Cross-Examination and thus Undercut His Ability to Defend Against His Charge

There is no serious doubt that Mr. Baker's absence had "a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge," *Snyder* 291 U.S. at 105–07, his absence having gutted his ability to confront at trial the only two testifying eyewitnesses against him. *See Kentucky*, 482 U.S. at 740 (indicating that a defendant has the right to be present at a hearing if his exclusion would interfere with his opportunity for effective cross-examination).

There is perhaps nothing that bears a more substantial relation to a defendant's opportunity to defend against a criminal charge than his ability to cross-examine those who take the stand against him:

> The opportunity for cross-examination, protected by the Confrontation Clause, is critical for ensuring the integrity of the fact-finding process. Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.

*Grayton v. Ercole*, 691 F.3d 165, 171 (2d Cir. 2012) (quoting *Kentucky*, 482 U.S. at 736). Yet, by excluding Mr. Baker from the April 6 Hearing and ordering that the Coles' housing benefit be kept secret until "immediately before the involved witness testifie[d]" (*See* Trial Tr. I 26:14–24), the trial court functionally stripped Mr. Baker of his right to prepare and conduct a cross-examination of the Coles on their potential motive to lie on the stand.

In doing so, the trial court imposed the sort of restriction on Mr. Baker's opportunity for cross-examination that the Supreme Court has found unconstitutional time and again. *See, e.g.*, *Davis v. Alaska*, 415 U.S. 308, 318 (1974) (Confrontation Clause was violated where defendant was precluded from "expos[ing] to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness"); *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) ("cutting off all questioning about an event . . . that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony" was a violation of the defendant's Confrontation Clause rights). Mr. Baker was prevented from exercising his fundamental right to cross-examine the key witnesses against him on their highly plausible motive to lie.

Had Mr. Baker known about the housing benefit and the Coles' inducement to testify against him (as he was entitled to), it is likely that he would have accepted a plea deal. Barring Mr. Baker from the April 6 Hearing and keeping him in the dark as to the Coles' added incentive to testify against him bore an undeniable relation to his opportunity to craft his defense. For this alone, Mr. Baker's exclusion from the April 6 Hearing marks an unconstitutional deprivation of his "right to presence" and requires that his conviction be undone.

### 3. The Second Circuit's Ruling in Grayton all but Dictates that Mr. Baker Was Stripped of His Right to Presence

In all of this, *Grayton* serves as a useful lodestar.  In *Grayton*, the Second Circuit found a constitutional right to be present at a hearing to determine whether a defendant, through misconduct, forfeited his right to cross-examine a witness at trial.  691 F.3d at 174.  No court in this Circuit—let alone the Supreme Court—had at that time ruled whether a defendant's right to presence attached at such a hearing.  But applying the same well-established law that governs this Court now, the Second Circuit held that the state court's denial of the right to presence was an unreasonable application of federal law.  *Id.*

*First*, the court found that Grayton likely would have been able to meaningfully assist his counsel at the hearing because he was "personally familiar with the witnesses and aware of any motive that they might have to fabricate."  *Id.* at 172.  So too here, Mr. Baker was personally familiar with the Coles and uniquely aware of any motive that they might have to lie in exchange for a housing benefit.  (*See* Ex. C-6, Baker Aff. ¶ 18.)

*Second*, the court held that Grayton's absence had a direct impact on his ability to defend himself because his exclusion "impaired [his] fundamental right to cross-examine the witnesses against him at trial."  *Grayton*, 691 F.3d at 173.  The same is true here.  The fact that Grayton's opportunity to cross-examine was forfeited, whereas Mr. Baker's was severely impaired but not removed, is a distinction without a difference.  *Grayton* says that a defendant has a constitutional right to be present where, like here, his absence would *impair* his "opportunity for full and effective cross-examination."  *Id.* (quoting *Kentucky*, 842 U.S. at 744).

*Grayton's* import is clear: Mr. Baker was denied his constitutional right to be present at the April 6 Hearing.

**B.    The State Court Unreasonably Excluded Mr. Baker Under the Guise of Vague, Unsubstantiated Claims of Witness Safety**

The First Department unreasonably overlooked Mr. Baker's constitutional deprivation on the ground that the completely unsubstantiated "concerns for the witnesses' safety" outweighed Mr. Baker's potential for input at the hearing. (*See* Ex. B-1, App. Ct. Op. at 9–10.) If a defendant's constitutional right to presence can ever be outweighed by safety concerns—which is a dubious proposition in its own right—surely such a constitutional deprivation will only ever be justified upon a fulsome showing supporting those concerns.

Here, there was no showing at all. In fact, when asked for its justification for the protective orders, the prosecutor had none until the court began to read the governing statute aloud clause by clause. (*See* Trial Tr. I 22:10–23:8.) Eventually the prosecutor replied, "We'll go with danger of physical harm. . . . We can go law enforcement, legitimate needs to be protected and security of the individual." (*See id.*). These unsubstantiated, boilerplate "rationales" fall well short of justifying Mr. Baker's exclusion from hearing that he had a constitutional right to attend.

**C.    Mr. Baker Did Not Waive His Constitutional Right to Be Present, and His Exclusion Was Anything but Harmless**

The state court did not find that Mr. Baker waived his right to be present, and the record belies any claim that Mr. Baker made a "voluntary, knowing and intelligent" waiver "with awareness of its consequences." *United States v. Morgan*, 51 F.3d 1105, 1110 (2d Cir. 1995). To be voluntary, a waiver must be "the product of a free and deliberate choice," *Moran v. Burbine*, 475 U.S. 412, 421 (1986), but here counsel for one of Mr. Baker's codefendants objected to the prosecutions' request for ex parte protection orders, which the trial court ultimately responded to by permitting *only* counsel to attend the otherwise ex parte hearing. (*See* Trial Tr. I 18–26.) Thus, even had he sufficient knowledge to constitute a knowing waiver—

which he did not—Mr. Baker's lack of contemporaneous objection cannot constitute a voluntary waiver where Mr. Baker reasonably understood the court to have decided the issue in response to the objection.  It would have been futile for Mr. Baker to speak up then, just as it would be improperly formalistic to retroactively require such a pro forma act now.

Mr. Baker's constitutional deprivation was anything but harmless: it handicapped his ability to confront the only two eyewitnesses to testify against him.  The state cannot come close to meeting its "heavy burden" to refute that there "'is any reasonable possibility of prejudice.'" *United States v. Fontanez*, 878 F.2d 33, 37 (2d Cir. 1989) (internal citations omitted) (finding that "the government [had] failed to demonstrate that the defendant's absence produced no reasonable possibility of prejudice).  Mr. Baker, therefore, asks this Court to vacate his conviction and order a new trial, where he will have a constitutionally adequate opportunity to cross-examine the witnesses to testify against him.

<u>**CONCLUSION**</u>

"The writ of habeas corpus is one of the centerpieces of our liberties," *McCleskey v. Zant*, 499 U.S. 467, 496 (1991), its core purpose to "insure that miscarriages of justice within its reach are surfaced and corrected."  *Harris v. Nelson*, 394 U.S. 286, 291 (1969).  Mr. Baker's petition is procedurally proper, his grounds for relief are substantiated and compelling, and he asks this Court to cure the several miscarriages of justice he has suffered.

47

\* \* \*

For the reasons stated in points I, II, and IV, Mr. Baker respectfully requests that this Court grant his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 and order the State to release Mr. Baker from custody; fashion a remedy to give Mr. Baker the benefit of the plea offer he rejected due to constitutional error (a fourteen year sentence with five years of post-release supervision for manslaughter); or grant him a new trial where he is adequately represented by counsel.

In the alternative, for the reasons stated in Point III, Mr. Baker respectfully requests that this Court vacate his sentence and order that he be resentenced after a hearing where he is adequately represented by counsel.

Dated:    New York, New York
          January 18, 2018

JOSEPH M. NURSEY, ESQ.
JNursey@appellatedefender.org
OFFICE OF THE APPELLATE DEFENDER
11 Park Place, Suite 1601
New York, NY 10007
(212) 402-4100

By: _____

      Ryan W. Cooke
      *Of Counsel*

RYAN W. COOKE, ESQ.
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000
Ryan.cooke@davispolk.com

*Attorneys for Petitioner*

48