UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SEAN BAKER,

                    Petitioner,

        – against –

JAMES CONWAY,

                    Respondent.

**OPINION & ORDER**

18-cv-478 (ER)

RAMOS, D.J.:

Petitioner Sean Baker ("Baker" or "Petitioner"), through his counsel, filed a petition for a writ of *habeas corpus* under 28 U.S.C. § 2254 ("Petition") on January 18, 2018.  Doc. 1.  Baker challenged his second degree murder conviction and corresponding sentence on various grounds.  *See generally id.*  The Court referred the Petition to Magistrate Judge Stewart D. Aaron on January 29, 2018.  Doc. 5.

On November 25, 2019, Judge Aaron issued a Report and Recommendation ("Report" or "R & R") recommending that the Court deny Baker's Petition in its entirety.  Doc. 26.  Baker filed his written objections to the Report on December 20, 2019.  Doc. 29.  The Bronx County District Attorney's Office[1] filed a response on March 9, 2022.  Doc. 34.  Baker replied on March 25, 2022.  Doc. 37.

For the reasons stated herein, the Court adopts the Report in its entirety, and the Petition is DENIED.

**I.      BACKGROUND**

The factual background and procedural history relevant to Baker's Petition are set forth in detail in Magistrate Judge Aaron's Report.  *See* Doc. 26.

---

[1] The Bronx County District Attorney's Office represents respondent James Conway, the superintendent of Attica Correctional Facility, where Baker is currently incarcerated, pursuant to an agreement with the Office of the Attorney General of the State of New York.  Doc. 34 at 1.

### A. Facts Underlying Baker's Murder Conviction

This case stems from the murder of Ramiro Ramos Luna.  *See* Doc. 1-21 at 23–24, 93–95, 199–200.[2]  Surveillance video captured Ramos' assault in the early hours of the morning on October 6, 2007.  *Id.* at 16–25.  Specifically, it registered three young men approach Ramos as he exited from El Patio, a restaurant in the Bronx.  *Id.* at 5, 318–19.  The video showed the three men "pushing [Luna] up the street, throwing him against the wall, going through the pockets . . . . dragging him back" and thereafter throwing him "down the stairs head first."  *Id.* at 12–13, 319.

Several eye-witnesses saw the assault take place.  *See id.* at 4–13.  Specifically, Barbara and Denise Coles—a mother and daughter who knew Baker and his co-defendants (Michael Allick and Kareem Warner) from the community—saw the three men take items from Ramos' pockets, drag him "towards the ditch," and "toss[] him down the stairs."[3]  *Id.* at 7–12.  The three men had different roles during the assault.  At the beginning of the encounter, all three men grabbed a hold of Ramos and dragged him away from the restaurant.  *Id.* at 21.  Thereafter, Warner and Allick held Ramos against the wall while Baker removed various items from his pockets.  *Id.* at 22.  The three men then dragged him toward a flight of stairs, where Allick pushed him down the steps.  *Id.* at 23–24.  Ms. Barbara Coles specifically testified that she saw Allick throw Ramos down the stairs while Baker and Warner stood next to him.  *Id.* at 12.

Paramedics arrived at the scene and found Ramos unresponsive at the bottom of the stairs about an hour later.  *Id.* at 93–95.  A forensic pathologist thereafter concluded that Ramos' cause of death was blunt force trauma to the head.  *Id.* at 200.

The Bronx Homicide Task Force investigated Ramos' murder and interviewed Barbara Coles in January 2008.  *Id.* at 228–29.  She identified Baker and his co-

---

[2] ECF Documents 1-21 and 1-22 contain the transcript from Baker's jury trial.  The Court cites to the ECF pagination.

[3] Barbara and Denise Coles were close enough to the scene that they were captured—and they identified themselves—in the surveillance video footage.  Doc. 1-21 at 18–19.

defendants, and the three young men were thereafter arrested.[4]  *Id.* at 228.  A Grand Jury indicted Baker and his co-defendants on two counts of murder in the second degree;[5] manslaughter in the first degree; robbery in the first degree; two counts of robbery in the second degree; and robbery in the third degree.  Doc. 1-8 at 9.

### B.  Baker's State Court Proceedings

Patrick Bruno, Baker's trial attorney, was appointed to represent him in 2008. Doc. 1-16 ¶ 17.  Dissatisfied with Bruno's representation, however, Baker mailed the court and the District Attorney's Office a *pro se* form Motion for Reassignment of Counsel in November 2008.  Doc. 1-15 at 36–39.  Among other things, Baker's form motion alleged the following:

> 6. This case has been pending for over [nine] months and my present attorney of record, Mr. P. L. Bruno, has also failed to:
>
> > a) Visit me at my place of confinement;
> > b) Inform me of any pertinent motion made, including bill of particulars, omnibus motion, suppression, etc, filed on my behalf;
> > c) Conduct an investigation in the matter of this action on my behalf;
> > d) Make any bail requests or reduction application on defendant's behalf.

*Id.* at 37.  The record does not reflect that the trial court ever addressed or otherwise ruled on the motion.[6]  *See* Doc. 2 at 15; *see also* Doc. 17 at 51.  The record does, however,

---

[4] Baker was seventeen years old at the time of his arrest.  *See* Doc. 1-16 ¶ 4.

[5] In New York, felony murder is one of various types of second-degree murder.  N.Y. Penal Law § 125.25(3); *Bethea v. Scully*, 834 F.2d 257, 258 (2d Cir. 1987).  Baker was convicted under this theory. Doc. 1-21 at 400.

[6] In a 2013 affidavit in support of his state habeas petitions, Baker provided more context for the circumstances that led to his reassignment motion.  *See* Doc. 1-16.  He asserted that he first met Bruno in 2008 via videoconference.  Doc. 1-16 ¶ 17.  According to Baker, the conversation "lasted about fifteen minutes," and Bruno told Baker that he could be found guilty of felony murder.  *Id.*  Additionally, "Mr. Bruno explained the possibility of a plea deal, and he told [Baker] that he might be able to get a sentence of 10 years for [Baker] through a plea agreement."  *Id.* at ¶ 19.  Baker claims, however, that Bruno's explanations were insubstantial and insufficient.  *See generally id.* ¶¶ 17–26.  Bruno apparently "did not explain the People's case against [Baker] or [his] chances at trial, and he did not tell [Baker] what the minimum or maximum sentences were for felony murder in New York."  *Id.* ¶ 19.  At the end of the conversation, Baker told Bruno that he would not take the plea deal.  *See id.*  Baker's affidavit further asserted that Bruno failed to explain the evidence in the case, visit Baker in jail, answer Baker's phone calls, discuss defense strategies, or properly investigate his case.  *Id.* ¶¶ 20–26.

reflect that Baker nevertheless continued to participate in his case, meeting with Bruno on various occasions and also appearing with him in court at various pre-trial conferences. *See* Doc. 17 at 19, 51–52; Doc. 29 at 14–15; *see also* Doc. 1-16 ¶¶ 20–28.

During one of his pre-trial hearings in January 2010, the Government provided Baker with a plea offer.  Doc. 1-16 ¶ 27; Doc. 1-18 at 8–10.  The proposed plea afforded Baker a determinate fourteen-year jail sentence with five years of post-release supervision in exchange for a plea of guilty to a charge of manslaughter.  Doc. 1-18 at 10. When the court asked Bruno whether he had had an opportunity to speak with Baker about the offer, Bruno indicated the following:

> Yes, I have.  He rejected the offer.  My offer, likewise, a 14 year offer would have included and covered a pending robbery, which incidentally did not occur while my client was at liberty, but he's rejecting the offer.

*Id.* at 12.[7]  The hearing transcript does not reflect that Baker objected or otherwise challenged Bruno's contention in any way.  *See id.*  Nevertheless, Baker claims that this was the first time he heard of the plea offer, Bruno offered him no advice regarding the offer, and Bruno otherwise failed to confirm that Baker understood the nature of the options before him.  Doc. 2 at 15–16.  He thus argues that his decision to deny the offer was "neither knowing nor informed."  *Id.* at 16.

The state court held various additional pre-trial hearings that Baker discusses in the instant petition.[8]  On April 6, 2010, the Government moved for two protective orders in regard to three potential trial witnesses pursuant to New York Criminal Procedure Law ("C.P.L.") § 240.50.  *See* Doc. 1-20 at 15–16.  Specifically, the prosecution made two requests.  *First*, the prosecutor asked for leave to make an *ex parte* application to protect

---

[7] John Morabito, the prosecutor that tried Baker's case, indicated that Baker had the opportunity to discuss the plea offer with Baker "for approximately thirty minutes," after the prosecution team and the judge had exited the courtroom.  Doc. 17-1 ¶ 5.  While one of Baker's co-defendants, Warner, accepted the Government's plea offer, Baker and Allick elected to proceed to trial.  Doc. 1-8 at 9 n.1.

[8] Baker did not raise his counsel reassignment motion at any of these hearings.  *See generally* Doc. 1-16 ¶ 26.

the nature of the benefit that Barbara and Denise Coles were to receive for their testimony.  *Id.  Second*, the prosecutor asked for leave to make an *ex parte* application to protect the name of an additional potential witness, Osvaldo Vargas, unless and until Vargas testified at trial.  *Id.* at 16, 23.  In support of both requests, the prosecutor highlighted the legitimate needs of law enforcement and the fact that the three witnesses faced the possibility of physical harm.  *See id.* at 16–26.  Allick's attorney requested that the applications be made in the presence of the lawyers for all three defendants.  *Id.* at 24.  Bruno agreed to that request.  *Id.* at 25.

The court directed that all counsel and the court reporter discuss the protective order requests outside the presence of the defendants.  *Id.* at 26.  It also indicated that the record in regard to the two protective orders would be sealed.  *Id.*  The court further noted that each attorney would be under a directive "not to disclose to his client until immediately before the involved witness testifies" the name of the witnesses subject to the proposed protective orders.  *Id.*; *see also id.* at 31.  The court granted the prosecution's applications for both protective orders.  *Id.*

Baker and Allick's trial began on April 14, 2010, and the jury convicted Baker of second degree murder six days later.[9]  Doc. 1-20 at 394–421; Doc. 1-22 at 123–30.  The court adjourned Baker's case for sentencing, directed the probation department to prepare a presentence memorandum, and instructed the parties to file sentencing submissions.[10]  *Id.* at 130.

The court sentenced Baker on May 12, 2010.  Doc. 1-23 at 1.  It asked the parties whether they had had an opportunity to review the Pre-Sentence Report ("PSR") filed by

---

[9] Warner pleaded guilty to Robbery in the First Degree and the state court sentenced him to eight years of imprisonment with five years of post-release supervision.  Doc. 1-8 at 9 n.1.  Allick and Baker were tried together.  *Id.*  Allick was convicted and sentenced to an indeterminate term of twenty-five years to life in prison.  *Id.*

[10] The record does not clarify whether sentencing submissions were in fact filed ahead of Baker's sentencing hearing.  *See* Doc. 1-23 at 1–14.  Nor do the parties make note of any such memoranda.

the Department of Probation. *Id.* at 3. Bruno stated that he read the report, waived any further delay, and he and Baker were both prepared to proceed. *Id.* Thereafter, the parties proceeded to make their sentencing arguments as to both the murder conviction and Baker's guilty plea as to an unrelated robbery offense. Notably, Bruno and the prosecutor both raised the fact that the PSR contained ambiguous or erroneous information.[11] *See, e.g.*, Doc. 1-23 at 3, 7–8.

In a brief statement regarding the murder conviction, the prosecutor asked for a maximum sentence of twenty-five years to life in prison. *Id.* at 4–5. It cited "two reasons" for its position: first, "this defendant should be isolated from open society for as long a period of time if he does not accept his responsibility, because he's a danger to the community." *Id.* at 4. Second, he noted that "[t]he responsibility for the death of the deceased is directly attributable to both defendants equally." *Id.* Bruno then had an opportunity to address the court. He stated the following:

> Your Honor, there is nothing I could add. You were present for the jury trial, you obviously paid very careful attention. I would be foolish to rehash any facts at this time.

*Id.* at 5.[12] The court thereafter asked Baker whether he wished to make a statement. *Id.* Baker said, "Not at all." *Id.*

---

[11] Baker contends that "Mr. Bruno never mentioned or specified, let alone corrected, any errors for the court." Doc. 2 at 19. The record shows otherwise. *See* Doc. 1-23 at 8. Bruno noted that "the probation report is confusing. At one point it acknowledges [that a prior offense of Baker's is] a [Youthful Offender offense] and then [the Department of Probation] refers to him as a predicate felon." *Id.* In other words, Bruno corrected the misstatement in the PSR by noting that Baker's prior offense had indeed been treated as a Youthful Offender conviction. *See id.*

[12] While Baker argues that Bruno should have drawn the Court toward his alleged lack of intent, mitigating factors, young age, and "deep remorse," Doc. 2 at 42, the Government contends that Bruno's "decisions were reasonable and strategic given the circumstances presented," Doc. 17 at 49; *see also id.* at 38. Indeed, in an affidavit filed in opposition to Baker's motion to vacate his judgment under § 440.10, District Attorney Emily Anne Aldridge indicated that Bruno stated the following in a phone call:

> [Bruno] further explained that telling a judge about a defendant's difficult childhood backfires the vast majority of the time and does not mitigate killing. He prefers to make brief records in front of sentencing judges so as not to "put the cart before the horse" for any future appeal.

Doc. 1-13 at 4.

In imposing Baker's sentence on his murder conviction, the court explained its reasoning and stated that:

> The credible evidence in this case established, beyond a reasonable doubt, in fact, beyond virtually any doubt whatsoever, that you, along with your co-defendants, robbed Mr. Ramos Luna in the early morning hours of October 6, 2007, that he was essentially helpless before, during and after the robbery, and that further, you assisted in the acts, which I agree with the prosecutor, were pointless, senseless, tragic, of throwing the victim down a flight of stairs, leading to his death.
>
> My task is to sentence you for this offense in a manner that takes into account the many functions that criminal sanctions are designed to advance, to find the appropriate balance that punishes you for your conduct, that gives the family and friends of Mr. Ramos, as well as the community at large, a right sense of justice, and if it helps, if at all, possibly to rehabilitate you.
>
> In doing this, I consider not only your past record, but note that you have not in any way, obviously prior to trial, but here today, weeks after the trial, accepted any responsibility for what you've done.  Without accepting responsibility for your conduct, it will be impossible for rehabilitation to begin.
>
> For these reasons, I now sentence you, upon your conviction of murder in the second degree, to an indeterminate term of incarceration in State prison, with a minimum of 20 years, a maximum of life in prison.

*Id.* at 5–6.  Bruno then noted that "I note that I will remain available should he exercise his right to appeal.  He's received a copy of those rights in writing."  *Id.* at 6.

The court then heard the parties' arguments as to Baker's unrelated robbery charge.  *Id.* at 6–7.  Bruno indicated that they "worked out a plea agreement."  *Id.* at 7. He further stated that Baker wanted "to withdraw his previously entered not guilty plea and now enter a plea of guilty to violation of Penal Law section 160.10, robbery in the second degree," with the understanding that he would be sentenced to "a four-year determinate sentence to run concurrent with the sentence just given on the homicide."  *Id.* at 9.  The court then asked Baker to confirm that that was, in fact, what he wanted to do. *Id.*  Baker affirmed that it was and that he had had enough time to speak with Bruno about the plea.  *Id.*  The court also asked Baker a series of questions in order to confirm that he understood the nature of his plea.  *Id.* at 10–11.  It then sentenced him to four years of

imprisonment and five years of post-release supervision on the robbery charge.  *Id.* at 11–12.

Baker timely appealed his murder conviction; however, he did not immediately perfect his appeal.[13]  Doc. 1-11 at 2.  Indeed, while his appeal was still pending, Baker filed a C.P.L. § 440.10 motion to vacate his murder conviction on April 15, 2014.  *See* Doc. 1-14.  He alleged that Bruno provided ineffective assistance of counsel during plea bargaining and at sentencing.  Doc. 1-14 at 17, 28.  He also argued that Bruno failed to provide meaningful representation before trial, ahead of his plea hearing, during his trial, and at sentencing, *id.* at 11, 13, 14, and noted that his motion for new counsel was never heard, *id.* at 12.

Along with his motion, Baker attached an affidavit that provided information about his background and his account of Bruno's representation.  *See generally* Doc. 1-16.  Among other things, he alleged that Bruno did not investigate his case "or make any effort to understand the facts," failed to properly advise him about his plea offer and sentencing exposure, and did not properly advise him about making a statement at his sentencing hearing.  *Id.* ¶¶ 51–53; *see supra* note 6; *but see* Doc. 1-16 ¶ 19 (noting that Baker's affidavit stated that Bruno "explained the possibility of a plea deal, and he told [Baker] that he might be able to get a sentence of 10 years for [him] through a plea agreement").  Baker also claimed that Bruno failed to provide him with a copy of the PSR, and he emphasized that "Mr. Bruno made no argument on my behalf" at sentencing. Doc. 1-16 ¶¶ 43–46.

Baker also attached to his § 440.10 motion an affirmation in support prepared by his new attorney, Katherine Marshall.  Doc. 1-15.  The affirmation discussed the relevant background and provided context for Baker's ineffective assistance arguments.  *See generally id.*  In the affirmation, attorney Marshall also stated the following:

---

[13] Baker did not perfect his appeal until it was consolidated with his appeal of the state court's decision regarding his subsequent C.P.L. § 440.10 motion to vacate his conviction.  Doc. 1-11 at 2; *see infra* note 15.

> I spoke with Patrick Bruno on August 20, 2013. Contrary to Mr. Baker's affidavit, Mr. Bruno claims that he properly advised Mr. Baker regarding his potential sentence exposure at trial and his plea offer. Mr. Bruno provided no reason for his failure to advocate for Mr. Baker at sentencing other than Mr. Bruno's belief that his advocacy would not have resulted in a more favorable sentence.

*Id.* ¶ 39.

The government filed a response in opposition to Baker's § 440.10 motion and attached an affirmation from Assistant District Attorney ("ADA") Emily Anne Aldridge. Doc. 1-13; *see also supra* note 12. The affirmation discussed the background of Baker's case leading up to his conviction and sentence. Doc. 1-13 ¶¶ 1–7. It also provided a detailed account of a conversation that ADA Aldridge had with Bruno in May of 2014. *Id.* ¶ 8. Specifically, Aldridge noted the following:

> On May 30, 2014, the undersigned had a telephone conversation with Mr. Bruno, a member of the 18-B Panel in Bronx County who was admitted to the bar in 1980. He explained that he had advised defendant to accept a plea. He explained the charges against defendant, including felony murder, and the sentencing exposure upon conviction. According to Mr. Bruno, defendant was adamantly against taking any plea. Mr. Bruno explained the evidence against defendant, but defendant believed that the video evidence of the crime was too foggy to definitively identify him. Mr. Bruno reminded him that there were two eyewitnesses who had known defendant for many years and were able to identify him. Defendant counted on the eyewitnesses not testifying. Defendant claimed that the People did not have a strong case against him. During the trial, defendant sat at the defense table grinning and making comments in the presence of the jury. Mr. Bruno made several visits to the pens to speak with defendant, and advised him to "wipe the grin off his face" and "look repentant." [ . . . ] Regarding the sentencing, Mr. Bruno spoke with defendant before the sentencing, and they were able to agree to a plea to an unrelated robbery case.

*Id.* ADA Aldridge further stated that Bruno mentioned that he preferred to make brief records in front of sentencing judges. *Id.*; *see supra* note 12.

Baker's § 440.10 motion was denied in its entirety, without a hearing, in September 2014. Doc. 1-11 at 2–11. Notably, it was denied by the same judge that presided over Baker's trial and sentenced him. *Compare id.* at 11 with Doc. 1-20 at 1; Doc. 1-23 at 1. In its opinion, the court stated that, "viewing the evidence and circumstances of this case in totality, counsel provided defendant with meaningful

representation which did not fall outside the 'wide range of professionally competent assistance'" under *Strickland v. Washington*, 466 U.S. 668 (1984) and corresponding state caselaw.  Doc. 1-11 at 5.  It added that "counsel zealously and competently represented defendant," highlighting "familiarity of the case and the relevant principles of evidentiary, substantive, and procedural law," as well as Bruno's "vigorous[]" cross-examination of the Government's witnesses.  *Id.* at 5–6.

The court specifically emphasized that Baker's allegations about Bruno's deficiencies at the plea stage were "completely belied by the hearing transcript."  *Id.* at 7.  And in regard to Baker's sentencing arguments, the court concluded that "there were no mitigating circumstances in the facts of the case," noting specifically that Bruno's failure to focus on Baker's "difficult upbringing would not have overcome [Baker's] refusal to accept responsibility, and the absence of any remorse on his part."  *Id.* at 10.  The court also clarified that Baker had the opportunity to speak on his own behalf, but he declined the opportunity to do so.  *Id.* at 9.

Finally, the court concluded by noting that "defendant's claim of ineffective assistance is devoid of any sworn allegations of fact to support such a claim. . . .  Here, defendant has not provided an affidavit from his attorney to corroborate defendant's version of events.  Nor has defendant provided an explanation for his failure to do so.  Absent an affidavit from such a potential witness, defendant's allegations are self-serving, unsubstantiated and fail to establish that counsel's performance was less than professional."  *Id.* at 10–11.[14]

Baker appealed the court's order denying his § 440.10 motion.[15]  *See People v. Baker*, 139 A.D.3d 591 (1st Dep't 2016).  He argued that he was improperly excluded

---

[14] Of note, Bruno passed away several months after the court denied Baker's § 440.10 motion.  *See* Doc. 26 14 n.15.

[15] Baker's appeal of the court's decision as to his § 440.10 motion was consolidated with the separate, unperfected appeal of his conviction originally filed on June 4, 2010.  *See supra* note 13.

from the pre-trial hearing regarding the Government's applications for various protective orders, denied his right to counsel when the trial court failed to address his *pro se* motion for the reassignment of counsel, and denied his constitutional right to effective assistance of counsel at the plea and sentencing stages. *See generally* Doc. 1-9. Baker also argued that the trial court erred when it denied his § 440.10 motion without holding a hearing. *Id.* at 55–59.

The Appellate Division affirmed the conviction and the trial court's denial of his § 440.10 motion in May 2016. *Baker*, 139 A.D.3d at 591. In regard to the hearing pertaining to the Government's protective order requests, the Appellate Division noted that Baker failed to show "that his presence would have been useful, and his various arguments about his ability to contribute [to that hearing were] unpersuasive." *Id.* It further concluded that Baker's interests in participating in that hearing were outweighed by "valid concerns for the witness' safety, underlying the need for defendant's exclusion." *Id.* (citation omitted).

Regarding Baker's motion for assignment of new counsel, the Appellate Division concluded that he abandoned the motion by "failing to call the court's attention to the fact that the existing motion remained unresolved." *Id.* at 591–92. It also stated that "[t]here [was] no indication in the record that the court was even aware that this document existed. In any event, the typical standard form motion did not contain the specific factual allegations of serious complaints about counsel necessary to trigger the court's obligation to make a minimal inquiry." *Id.* at 592.

Finally, the Appellate Division determined that Baker's ineffective assistance claims were without merit "under the state and federal standards." *Id.* (citations omitted). Considering Baker's arguments about counsel's ineffectiveness at the plea stage, the Appellate Division noted that Baker's affidavit was "inconsistent with the trial record, self-contradictory, uncorroborated by any other evidence, and otherwise without merit." *Id.* Additionally, "[w]ith regard to defendant's claim of ineffective assistance in

11

connection with sentencing, defendant, who received less than maximum sentence despite the heinous facts of the crime, has not shown that the additional steps he faults his counsel for omitting could have led to even greater leniency." *Id.*

Baker timely sought leave to appeal the Appellate Division's decision.  Doc. 1-5 at 2–3.  The New York Court of Appeals denied his application.  Doc. 1-1 at 3.

### C.  The Instant § 2254 Petition

Baker filed the *habeas corpus* petition now before the Court nearly two years later, on January 18, 2018.  Doc. 1.  He raised four grounds for relief, each of which he previously brought in state court:  (1) he was denied his Sixth Amendment right to counsel when the state trial court failed to adjudicate his motion for new counsel; (2) he was denied his Sixth Amendment right to the effective assistance of counsel at the plea stage; (3) he was denied his Sixth Amendment right to effective assistance of counsel at sentencing; and (4) the trial court denied him his constitutional right to presence at a material pre-trial hearing.  Doc. 2 at 9–55.

The Government filed a response in opposition on July 13, 2018.  Doc. 17.  Baker filed a reply on September 28, 2018.  Doc. 22.  Judge Aaron then issued the Report on November 25, 2019.  Doc. 26.  Thereafter, Baker filed his objections to the Report on December 20, 2019.  Doc. 29.  The Government responded on March 9, 2022, and Baker replied on March 25, 2022.  Doc. 34; Doc. 37.

## II.   STANDARD OF REVIEW

### A.  AEDPA Review of the State Court Proceedings

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214, habeas petitions filed under 28 U.S.C. § 2254 may not be granted unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C.

§ 2254(d)(1), (d)(2).  This deference is required under the AEDPA if the petitioner's claim "was adjudicated on the merits in State court proceedings."  28 U.S.C. § 2254(d); *see Bell v. Miller*, 500 F.3d 149, 154–55 (2d Cir. 2007).

"Th[e] statutory phrase ['clearly established Federal law, as determined by the Supreme Court of the United States,'] refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision."  *Williams v. Taylor*, 529 U.S. 362, 365 (2000).  In order for a federal court to find that the state court's application of Supreme Court precedent was unreasonable, the decision must be objectively unreasonable rather than simply incorrect or erroneous.  *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  The factual findings made by state courts are presumed to be correct under the AEDPA, and petitioner has the burden to rebut this presumption by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see Nelson v. Walker*, 121 F.3d 828, 833 n.4 (2d Cir. 1997).

Additionally, "[i]f a state court's prior denial of a claim rested on an adequate and independent state ground, a federal court may not consider an issue of federal law raised in a state prisoner's petition for a writ of habeas corpus."  *Murray v. New York*, No. 13 Civ. 5212 (ER), 2019 WL 2502101, at *5 (S.D.N.Y. June 17, 2019) (citation omitted).  In "all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  A procedural bar is "adequate" if it is "based on a rule that is 'firmly established and regularly followed' by the state in question."  *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (quoting *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991).  Violation of firmly established rules is "[o]rdinarily . . . adequate to foreclose review of a federal claim."  *Lee v. Kemna*, 534 U.S. 362, 376 (2002).  However, there are

"exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question."[16]  *Id.*

To demonstrate cause, a petitioner must adduce "some objective factor external to the defense" which explains why he did not raise the claim previously.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Such factors may include:  (a) interference by government officials making compliance impracticable; (b) situations in which the factual or legal basis for a claim was not reasonably available to counsel; and (c) ineffective assistance of counsel.  *See id.* at 488; *see also Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994) (quoting *Carrier*, 477 U.S. at 488).  A showing of prejudice requires a petitioner to demonstrate that failure to raise the claim previously had a substantial injurious effect on his case such that he was denied fundamental fairness.  *Reyes v. New York*, No. 99 Civ. 3628 (SAS), 1999 WL 1059961, at *2 (S.D.N.Y. Nov. 22, 1999).  Finally, to establish a fundamental miscarriage of justice, a petitioner must demonstrate that he is "actually innocent."  *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001).

## B.  Review of the Magistrate Judge's Report

A district court reviewing a magistrate judge's Report and Recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).  Parties may raise "written" objections to the report and recommendation "[w]ithin fourteen days after being served with a copy."  *Id.*; Fed. R. Civ. P. 72(b)(2).  A district court reviews *de novo* those portions of the Report and Recommendation to which timely and specific objections are made.  28 U.S.C.

---

[16] The Second Circuit has clarified that courts should consider three "guideposts" in determining whether a case fits within that "limited category":  "(1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had 'substantially complied' with the rule given 'the realities of trial,' and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.  *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (quoting *Lee*, 534 U.S. at 381–85.)  In doing so, the Second Circuit made clear that "these three factors were not presented as a 'test' for determining adequacy."  *Id.*

§ 636(b)(1)(C); *see also United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 38 (2d Cir. 1997).  The district court may adopt those parts of the Report and Recommendation to which no party has timely objected, provided no clear error is apparent from the face of the record.  *Lewis v. Zon*, 573 F. Supp. 2d 804, 811 (S.D.N.Y. 2008) (citations omitted).  The district court will also review the Report and Recommendation for clear error where a party's objections are "merely perfunctory responses, argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original petition."  *Ortiz v. Barkley*, 558 F. Supp. 2d 444, 451 (S.D.N.Y. 2008) (citations and internal quotation marks omitted); *see also Genao v. United States*, No. 08 Civ. 9313 (RO), 2011 WL 924202, at *1 (S.D.N.Y. Mar. 16, 2011) ("In the event a party's objections are conclusory or general, or simply reiterate original arguments, the district court reviews the [R & R] for clear error.").

## III.   BAKER'S OBJECTIONS

Baker objects to each of the conclusions set out in Judge Aaron's Report.  *See generally* Doc. 29; *see also* Doc. 26.  Specifically, Baker asserts that the Report erroneously concluded that:  (1) with respect to Baker's claim of ineffective assistance of counsel at the plea stage, "the only question before [Judge Aaron] was whether the state court's factual determination regarding Mr. Bruno's conduct was reasonable"; (2) with respect to Baker's claim of ineffective assistance of counsel at the sentencing stage, "the state court properly applied *Strickland*"; (3) the state trial court's failure to address Baker's motion for new counsel did not deprive him of his Sixth Amendment rights; and (4) the state court did not violate Mr. Baker's right to be present at a material stage of trial.  Doc. 29 at 6, 8, 12, 17.  For the reasons stated below, the Court adopts each of the recommendations set out in the Report.

### A.   Baker's *Strickland* Claims

"A defendant in criminal proceedings has a right under the Sixth Amendment to effective assistance from his attorney at all critical stages in the proceedings, which

include entry of a plea of guilty, and sentencing."  *Gonzalez v. United States*, 722 F.3d

118, 130 (2d Cir. 2013) (internal citations omitted).  To succeed on a claim of ineffective

assistance of counsel, a claimant must satisfy the two-part test established by the

Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984):

> "Under *Strickland*, in order to prevail on an ineffective-assistance-of-
> counsel claim, a defendant must meet a two-pronged test:  (1) he 'must
> show that counsel's performance was deficient,' so deficient that, 'in light
> of all the circumstances, the identified acts or omissions were outside the
> wide range of professionally competent assistance,' and (2) he must show
> 'that the deficient performance prejudiced the defense,' in the sense that
> 'there is a reasonable probability that, but for counsel's unprofessional
> errors, the result of the proceeding would have been different.'"

*Bennett v. United States*, 663 F.3d 71, 84 (2d Cir. 2011) (quoting *Strickland*, 466 U.S. at

687, 690, 694); *see also Hill v. Lockhart*, 474 U.S. 52, 58 (1985).

Under the first prong of *Strickland*, the Court must "judge the reasonableness of

counsel's challenged conduct on the facts of the particular case, viewed as of the time of

counsel's conduct."  *Strickland*, 466 U.S. at 690.  The Court "must make 'every effort to

eliminate the distorting effects of hindsight,' and 'indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance; that

is, the defendant must overcome the presumption that, under the circumstances, the

challenged action might be considered sound trial strategy.'"  *Bell*, 500 F.3d at 156

(quoting *Strickland*, 466 U.S. at 689).  The convicted defendant is required to "identify

the acts or omissions of counsel that are alleged not to have been the result of reasonable

professional judgment," and the court "must then determine whether, in light of all the

circumstances, the identified acts or omissions were outside the wide range of

professionally competent assistance."  *Strickland*, 466 U.S. at 690.

Under the second prong of *Strickland*, the petitioner must establish prejudice.

"To establish prejudice, a petitioner 'must show that there is a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have been

different.  A reasonable probability is a probability sufficient to undermine confidence in

the outcome.'" *Kovacs v. United States*, 744 F.3d 44, 51 (2d Cir. 2014) (quoting *Strickland*, 466 U.S. at 694).  To satisfy reasonable probability, "the defendant must show more than that the unprofessional performance merely had some conceivable effect . . . [;] however, a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (internal quotation marks and citations omitted).

"In the plea bargain context, the petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances, or that there is a reasonable probability that he could have negotiated a [more favorable] plea . . . or that he would have litigated an available defense." *Whyte v. United States*, No. 08 Crim. 1330 (VEC), 2015 WL 4660904, at *5 (S.D.N.Y. Aug. 6, 2015) (internal quotation marks and citations omitted); *see also Missouri v. Frye*, 566 U.S. 134, 147 (2012) ("To establish prejudice in this instance, it is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time.").  Courts must also "keep in mind that 'a defendant has no right to be offered a plea, nor a federal right that the judge accept it.'" *Kovacs*, 744 F.3d at 51 (quoting *Frye*, 566 U.S. at 148–49).

### 1. Baker's Claim Regarding Ineffective Assistance of Counsel at the Plea Stage

With respect to Baker's claim of ineffective assistance of counsel at the plea stage, he argues that "the R & R erroneously determines . . . that Mr. Baker's arguments should be disregarded because the state court rejected the same allegations."  Doc. 29 at 6.  He focusses this argument on his contention that the Report does not sufficiently address both prongs of § 2254(d).  *Id.*

The Second Circuit has made clear that "failure to give any advice concerning acceptance of [a] plea bargain [is] below the standard of reasonable representation." *Cullen v. United States*, 194 F.3d 401, 404 (2d. Cir. 1999).  "An attorney's failure to

communicate a plea offer to his client, or to advise his client adequately about the plea

offer, may [also] constitute constitutionally deficient assistance." *Abraham v. Lee*, No.

13 Civ. 2525 (RWS), 2014 WL 3630876, at *9 (S.D.N.Y. July 22, 2014) (citing *Cullen*,

194 F.3d at 404). Where a defendant claims that he elected to reject an offer due to his

attorney's alleged deficiencies, the defendant "must show that but for the ineffective

advice of counsel there is a reasonable probability that . . . the defendant would have

accepted the plea and the prosecution would not have withdrawn it in light of intervening

circumstances, that the court would have accepted its terms, and that the conviction or

sentence, or both, under the offer's terms would have been less severe than under the

judgment and sentence that in fact were imposed." *Lafler v. Cooper*, 566 U.S. 156, 164

(2012).

   In this case, Baker argues that "[t]he state appellate court's denial of Mr. Baker's

claims of ineffective assistance of counsel at the plea-bargaining stage of his trial was

contrary to and an unreasonable application of the Supreme Court's decision in

*Strickland* and numerous decisions of this Circuit." Doc. 2 at 31. He specifically states

that "[s]hirking a thorough constitutional analysis, the First Department dismissed Mr.

Baker's claim out of hand . . . .'" *Id.* at 32.

   The Court adopts the Report's recommendation and denies this claim. *See* Doc.

26 at 24–27. The Appellate Division's opinion makes clear that it assessed Baker's case

"under the state and federal standards" and concluded that the record did not support his

contention that Bruno's assistance was deficient. *Baker*, 193 A.D.3d at 592 (quoting

*People v. Benevento*, 91 N.Y.2d 708, 713–14 (1998) and *Strickland*, 466 U.S. at 668). In

support of that contention, the Appellate Division stated that Baker's affidavit, which

contained his allegations regarding Bruno's purported deficiencies, "was inconsistent

with the trial record, self-contradictory, uncorroborated by any other evidence, and

otherwise without merit." *Id.*

Considering the record, including the trial transcripts and the various affidavits that have been filed in Baker's cases over the course of the last decade, it is clear that the Appellate Division's conclusion does not warrant relief under *either prong* of § 2254(d). Baker has failed to show that the Appellate Division's conclusion that Bruno's assistance was sufficiently effective was "contrary to, or involved an unreasonable application of, clearly established Federal law, as defined by the Supreme Court of the United States; or [] resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)–(2).

In support of his argument, Baker defers to the allegations set out in his 2014 affidavit—that Bruno failed to "convey basic, but essential, information regarding the plea offer."  Doc. 2 at 34; *see also* Doc. 1-16.  However, those assertions are belied by the record here.  Baker's own affidavit states that Bruno "explained the possibility of a plea deal, and he told me that he might be able to get a sentence of 10 years for me through a plea agreement."[17]  Doc. 1-16 ¶ 19.  Furthermore, the attorney that represented Baker when he filed his 2014 § 440.10 motion filed affirmation stating that she spoke with Mr. Bruno, who said the following:

> Contrary to Mr. Baker's affidavit, Mr. Bruno claims that he properly advised Mr. Baker regarding his potential sentence exposure at trial and his plea offer.

Doc. 1-15 ¶ 39.  And the Government provided an additional affidavit corroborating that version of events.  After speaking with Bruno in 2014, ADA Aldridge affirmed that Bruno said "he had advised defendant to accept a plea."  Doc. 1-13 ¶ 8.  Aldridge added that

---

[17] In the same affidavit, Baker later stated that he and Bruno "did not discuss a possible plea agreement before the hearing or afterwards."  Doc. 1-16 at ¶ 28.  The Court emphasizes that Baker's claims about Bruno's deficiencies are not only undercut by his own statements, but by the subsequent statements of attorneys from both sides.  Doc. 1-13 ¶ 8; Doc. 1-15 ¶ 39.  Importantly, this record was before the Appellate Division when it concluded that Baker's contentions were "inconsistent with the trial record, self-contradictory, uncorroborated by any other evidence, and otherwise without merit."  *Baker*, 193 A.D.3d at 592.  Accordingly, the Court cannot conclude that its decision was an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d)(2).

Bruno said he "explained the charges against defendant, including felony murder, and the sentencing exposure upon conviction." *Id.* Importantly, Bruno stated that Baker "was adamantly against taking any plea," but Baker "believed that the video evidence of the crime was too foggy to identify him." *Id.* Bruno further told ADA Aldridge that he "reminded [Baker] that there were two eyewitnesses who had known defendant for many years and were able to identify him," but Baker "counted on the eyewitnesses not testifying." *Id.*

Accordingly, the Appellate Division's conclusion as to the constitutional effectiveness of Bruno's representation was not, in fact, contrary to the Supreme Court's decision in *Strickland*, or otherwise unreasonable. Taken together, the evidence in this case makes clear that his plea discussions were within the realm of reasonableness.[18] *Strickland*, 466 U.S. at 690. Critically, the Court "must make 'every effort to eliminate the distorting effects of hindsight,' and 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Bell*, 500 F.3d at 156 (quoting *Strickland*, 466 U.S. at 689). That task is straightforward here.

Finally, to the extent that Baker continues to assert that Bruno failed to provide him with effective assistance at the plea stage, the Court agrees with Judge Aaron's

---

[18] Baker argues that his case presents "similar facts" to those set out in *Carrion v. Smith*, wherein a habeas petitioner rejected a plea offer and the court found that the petitioner met the first prong of *Strickland*. 644 F. Supp. 2d 452, 455–57 (S.D.N.Y. 2009), *aff'd*, 365 F. App'x 278 (2d Cir. 2010). There, the district court found credible the petitioner's testimony that his trial attorney failed to advise him of the sentencing exposure he faced were he convicted at trial and also failed to give him advice regarding the advisability of accepting the plea offer. *Id.* at 467. The facts in Baker's case are different. First, the record contains evidence that calls into question the credibility of the self-serving statements that Baker has made in his various challenges to his conviction. *See supra* note 17. Second, in this case, Baker's own words clarify that Bruno informed him he could be found guilty of felony murder at trial, Doc. 1-16 ¶ 17, explained to Baker that two eye-witnesses would be testifying against him, *id.* at ¶ 18, and also "explained the possibility of a plea deal," and "told [him] that he might be able to get a sentence of 10 years," as opposed to the possible exposure on a felony murder conviction, "through a plea agreement, *id.* at ¶ 19. Given Baker's own admissions regarding these aspects of Bruno's representation, his comparisons to *Carrion* are unavailing.

finding that Baker has failed to show "a reasonable probability" that he would have accepted the plea offer prior to trial but for Bruno's alleged deficient assistance. *Lafler*, 566 U.S. at 164; *see also* Doc. 26 at 26. The record is replete with evidence showing that Baker was adamantly against taking a plea deal or accepting guilt in any way. *See, e.g.*, Doc. 1-13 at 3; Doc. 1-23 at 6; Doc. 17-1 ¶ 5.

For all of these reasons, the Court adopts Judge Aaron's recommendation and denies Baker's claim regarding Bruno's alleged ineffective assistance at the plea stage.

### 2.   *Baker's Claim Regarding Ineffective Assistance of Counsel at Sentencing*

Baker also objects to the R & R's conclusion as to his claim of ineffective assistance of counsel at the sentencing stage. He argues that the R & R improperly (1) concluded that *Strickland*, rather than *United States v. Cronic*, 466 U.S. 648 (1984), applies to his case, and (2) determined that the Appellate Division did not unreasonably apply *Strickland*. Doc. 29 at 8.

It is well settled that criminal defendants enjoy the right to the effective assistance of counsel at the sentencing stage. *Gardner v. Florida*, 430 U.S. 349, 358 (1977); *Glover v. United States*, 531 U.S. 198, 200 (2001). Ordinarily, claims regarding the deficiency of counsel at sentencing are subject to review under *Strickland*. *See Lafler*, 566 U.S. at 165. *Strickland* requires petitioners to demonstrate that counsel was constitutionally deficient, and that deficient performance prejudiced the defense. *Bennett*, 663 F.3d at 84.

"In certain *rare* cases," Doc. 2 at 29 (emphasis added), however, where the circumstances of a case "are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified," *Cronic*, 466 U.S. at 658, a presumption of prejudice may be appropriate, *id.* at 660. The Supreme Court has made clear that "[c]ircumstances of that magnitude" are unusual. *Id.* at 659. Indeed, it noted that such circumstances "may be present on some occasions when . . . the likelihood that any lawyer, even a fully competent one, could provide effective assistance is *so small* that a

presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.* at 650–60 (emphasis added).

The Court agrees with Judge Aaron's conclusion that the *Cronic* presumption does not apply here, and it adopts the R & R's recommendation as to Baker's claim regarding ineffective assistance at sentencing.

First, contrary to Baker's contentions, the R & R appropriately concluded that the circumstances of his case did not warrant a presumption of prejudice. Doc. 26 at 28. In *Cronic*, the Supreme Court provided examples of the types of situations that warrant such a presumption—situations that are easily distinguished from Bruno's alleged deficiencies. Notably, the *Cronic* Court used *Powell v. Alabama*—a Sixth Amendment case stemming from the 1932 rape convictions of various young, Black men in Alabama state court—as the prototypical example of such prejudice. *Cronic*, 466 U.S. at 660 (discussing the facts of *Powell v. Alabama*, 287 U.S. 45 (1932)). To illustrate the nature of cases where the presumption of prejudice should be made, the Court provided the following context about *Powell*:

> The defendants had been indicted for a highly publicized capital offense. Six days before trial, the trial judge appointed "all the members of the bar" for purposes of arraignment. "Whether they would represent the defendants thereafter if no counsel appeared in their behalf, was a matter of speculation only, or, as the judge indicated, of mere anticipation on the part of the court." *Id.* 287 U.S., at 56. On the day of trial, a lawyer from Tennessee appeared on behalf of persons "interested" in the defendants, but stated that he had not had an opportunity to prepare the case or to familiarize himself with local procedure, and therefore was unwilling to represent the defendants on such short notice. The problem was resolved when the court decided that the Tennessee lawyer would represent the defendants, with whatever help the local bar could provide.
>
> "The defendants, young, ignorant, illiterate, surrounded by hostile sentiment, haled back and forth under guard of soldiers, charged with an atrocious crime regarded with especial horror in the community where they were to be tried, were thus put in peril of their lives within a few moments after counsel for the first time charged with any degree of responsibility began to represent them." *Id.* at 57–58.
>
> This Court held that "such designation of counsel as was attempted was either so indefinite or so close upon the trial as to amount to a denial of effective and substantial aid in that regard." *Id.* at 53. The Court did not

> examine the actual performance of counsel at trial, but instead concluded
> that under these circumstances the likelihood that counsel could have
> performed as an effective adversary was so remote as to have made the
> trial inherently unfair.  Powell was thus a case in which the surrounding
> circumstances made it so unlikely that any lawyer could provide effective
> assistance that ineffectiveness was properly presumed without inquiry into
> actual performance at trial.

*Cronic*, 466 U.S. at 660–61 (footnotes omitted).

Here, Baker failed to raise circumstances rising to that magnitude.  The record does not support a conclusion that Baker "was denied the presence of counsel" at sentencing.[19]  *Id.* at 662.  Nor does it support the conclusion that "there was a breakdown in the adversarial process that would justify a presumption that [Baker's] conviction was insufficiently reliable to satisfy the Constitution."  *Id.*  To be sure, Bruno provided a very short statement at Baker's sentencing hearing.  Doc. 1-23 at 5.  However, Bruno stated that he did so for strategic reasons, to avoid putting the "cart before the horse."  Doc. 1-13 at 4.  Critically, the mere short length of an attorney's statement at sentencing cannot automatically render that counsel's assistance presumptively ineffective.  Such a rule would be contrary to the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" that courts must apply when reviewing *habeas corpus* cases.  *Bell*, 500 F.3d at 156.

With this context established, the Court also agrees with the R & R's determination that the Appellate Division did not unreasonably apply *Strickland*.  Doc. 26 at 28–30.  In its opinion, the Appellate Decision noted that "defendant, who received a less than maximum sentence despite the heinous facts of his crime, has not shown that the

---

[19] Baker's reliance on the Seventh Circuit's opinion in *Miller v. Martin* is misplaced.  481 F.3d 468 (7th Cir. 2007) (*per curiam*).  In *Miller*, the petitioner "was convicted *in absentia* after failing to appear for trial, attended his own sentencing hearing but remained silent throughout the proceedings on the advice of his attorney," and the attorney "likewise refused to participate" at sentencing hearing.  *Id.* at 470.  The Seventh Circuit concluded that the *Cronic* presumption of prejudice applied to Miller's case because his attorney's "advocacy at sentencing was so non-existent as to fall within even a very narrow exception."  *Id.* at 473.  Indeed, it emphasized that, in the attorney's own words, he "did nothing."  *Id.*  As discussed herein, Bruno participated in Baker's sentencing hearing by noting errors in the PSR, asserting that one of Bruno's prior offenses qualified as Youthful Offender conviction, and otherwise participating in discussions about Baker's guilty plea on an unrelated robbery charge.  Doc. 1-23 at 1–8.  Accordingly, *Miller* does not support Baker's arguments about the application of the *Cronic* presumption in his case.  *See* Doc. 29 at 9–11.

additional steps he faults his counsel for omitting could have led to even greater leniency." *Baker*, 139 A.D.3d at 592.  While Baker contends that Bruno failed to share the PSR with him and make various arguments at sentencing, he has not shown that the Appellate Division's judgment as to that representation was contrary to federal law as established by the Supreme Court or otherwise resulted on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).

For all the reasons already discussed herein, the record does not support the conclusion that Bruno's performance was so deficient that it was outside the wide range of professionally competent assistance, nor that it produced a result that would have been different absent his purported deficiencies.  *Bennett*, 663 F.3d at 84 (quoting *Strickland*, 466 U.S. at 687, 690, 694).  Critically, in its review of Baker's § 440.1 motion to vacate—which contained the exact same arguments about Bruno's purported deficiencies that are now before the Court—the sentencing judge stated that "there were no mitigating circumstances in the facts of the case" that Bruno could have highlighted to affect his sentence, noting specifically that Bruno's failure to focus on Baker's "difficult upbringing would not have overcome [his] refusal to accept responsibility, and the absence of any remorse on his part."  Doc. 1-11 at 10.

Additionally, as the R & R emphasizes, the sentencing judge "was well aware of the facts regarding the case against Baker and Baker's role in the crime."  Doc. 26 at 29.  Indeed, the trial judge noted that "[t]he credible evidence in this case established, beyond a reasonable doubt, in fact, beyond virtually any doubt whatsoever, that you, along with your co-defendants, robbed Mr. Ramos Luna in the early morning hours of October 6, 2007, that he was essentially helpless before, during and after the robbery, and that further, you assisted in the acts, which I agree with the prosecutor, were pointless, senseless, tragic, of throwing the victim down a flight of stairs, leading to his death."  Doc. 1-23 at 5.

Given these circumstances, the Appellate Division's conclusion that Baker received effective assistance at sentencing was neither an unreasonable application of federal law nor an unreasonable determination of the facts. *Strickland*, 466 U.S. at 690; *see also* 28 U.S.C. § 2254(d)(1)–(2). This claim is thus denied.

### B. Baker's Claim Regarding His *Pro Se* Motion for New Counsel

Baker further argues that Judge Aaron's report erroneously concluded that his Sixth Amendment claim regarding his unheard motion for new counsel is procedurally barred. Doc. 29 at 12. Specifically, Baker contends that the application of New York's abandonment rule is "exorbitant" in this case. *Id.* He also emphasizes his position that he established cause and actual prejudice to excuse any procedural default. *Id.* at 15. In response, the Government counters that the claim is indeed barred due to Baker's abandonment of the motion. Doc. 34 at 6. It further claims that Baker failed to make a showing of sufficient cause and prejudice. *Id.* at 6–7.

The Sixth Amendment, which applies to the states through the Fourteenth Amendment, provides: "In all criminal prosecutions, the accused shall enjoy . . . the Assistance of Counsel for his defence." U.S. Const. amend VI. "While the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant *rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.*" *Wheat v. United States,* 486 U.S. 153, 159 (1988) (emphasis added). The Sixth Amendment also does not "guarantee[] a meaningful relationship between an accused and his counsel." *Morris v. Slappy,* 461 U.S. 1, 14 (1983) (internal quotation marks omitted). Thus, "[a] court need go no further than ensuring that each defendant has an 'effective advocate.'" *Allison v. Khahaifa*, No. 10 Civ. 3453 (KAM), 2011 WL 3298876, at *9 (E.D.N.Y. Aug. 1, 2011) (quoting *Wheat,* 486 U.S. at 160).

Additionally, as stated above, *habeas* petitions filed under 28 U.S.C. § 2254 may not be granted unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (d)(2); *see also* Doc. 17 at 60. And "[i]f a state court's prior denial of a claim rested on an adequate and independent state ground, a federal court *may not* consider an issue of federal law raised in a state prisoner's petition for a writ of habeas corpus." *Murray*, 2019 WL 2502101, at *5 (emphasis added). However, "[t]he adequacy of state procedural bars to the assertion of federal questions is not within the State's prerogative finally to decide; rather, adequacy is itself a federal question." *Cone v. Bell*, 556 U.S. 449, 465 (2009) (internal quotation marks and alteration omitted). Thus, courts "have an independent duty to scrutinize the application of state rules that bar [its] review of federal claims." *Id.* at 468.

In this case, the Court agrees with the R & R's conclusion that Baker's claim is procedurally barred, and Baker failed to meet his burden to overcome the default. First, the Court agrees that the Appellate Division's decision rested on an adequate and independent state ground. *Murray*, 2019 WL 2502101, at *5; *see also Garcia*, 188 F.3d at 77; Doc. 26 at 21. As Judge Aaron emphasizes in his report, "[a]bandonment is firmly established and regularly followed in New York." Doc. 26 at 21 (quoting *Jamison v. Griffin*, No. 15 Civ. 6716 (PKC) (AJP), 2016 WL 1698350, at *47 (S.D.N.Y. Apr. 27, 2016)). And federal courts have made clear that "[a]bandonment is an independent and adequate state procedural ground which ordinarily bars habeas review." *Pendergast v. Rivera*, No. 06 Civ. 5314 (BMC), 2011 WL 4899945, at *4 (E.D.N.Y. Oct. 13, 2011).

Second, because the Court concludes that the record fails to show "actual prejudice" as defined by the Supreme Court in *Murray v. Carrier*, it adopts the Report's recommendation that this claim should be denied. 477 U.S. at 494; *see also* Doc. 1-15 at

36–39.  Indeed, to meet his burden, Baker had to show that the error he raises "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *Carrier*, 477 U.S. at 494 (internal citations and emphases omitted).

Baker has not met that burden here.  In his objections to the R & R, Baker stated the following in regard to actual prejudice:

> [T]he degree of actual prejudice resulting from the trial court's failure to address his motion, when viewed in the total context of the events at trial, [ . . . ], is clear:  Mr. Bruno remained on Mr. Baker's case, and his advocacy (or lack thereof) was so ineffective as (1) to waive Mr. Baker's constitutional right to be present at a protective order hearing . . . and (2) to effectively leave him without an advocate at the sentencing and plea stages . . . .

Doc. 29 at 16.

As a preliminary matter, Baker erroneously assumes that the state trial court would have necessarily granted his motion for the reassignment of counsel if it had taken the opportunity to adjudicate it.  *Id.*  To the contrary, the record is replete with evidence showing that the court believed that Bruno provided Baker with adequate and competent representation.  *See generally* Doc. 1-11; *see also* Doc. 1-18; Doc. 1-19; Doc. 1-20; Doc. 1-21; Doc. 1-22; Doc. 1-23.  Additionally, Baker's arguments require the presumption that (1) a new attorney would have made materially different advocacy decisions in regard to the Government's request for the pre-trial protective order hearing, plea negotiations, and sentencing argumentation, and (2) those advocacy decisions would have resulted in a different outcome for Baker.  *See* Doc. 29 at 16.  The record not only contains evidence contradicting Baker's characterization of Bruno's advocacy at each of those stages, but it also provides a basis for the conclusion that different advocacy decisions would not have resulted in a different outcome in this case.  *See* Doc. 1-11 at 10.

Accordingly, Baker failed to overcome the procedural bar here.  *Thompson*, 501 U.S. at 750.  The record does not support the conclusion that the trial court's failure to

address his motion for the reassignment of counsel resulted in actual prejudice or a fundamental miscarriage of justice considering the "total context of events at trial." *Id.*; *United States v. Frady*, 456 U.S. 152, 170 (1982); *Artuz*, 269 F.3d at 90 (concluding that to establish a fundamental miscarriage of justice, a petitioner must demonstrate that he is "actually innocent").

Baker insists that the application of New York's abandonment rule is "exorbitant" in this case.  Doc. 29 at 12; *see Cotto*, 331 F.3d at 240 (listing the three considerations courts evaluate in determining whether a case presents "exceptional" circumstances  in which "exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question") (quoting *Lee*, 534 U.S. at 376).  The Court disagrees.  While the record does not clarify whether the trial judge relied on the abandonment rule when it failed to address Baker's motion, it certainly does not support the conclusion that "perfect compliance with the state rule would have changed the trial court's decision."  *Cotto*, 331 F.3d at 240.  In other words, for the reasons already stated herein, the record does not indicate that the court would have granted Baker's motion for new counsel had he properly raised it before proceeding with his case.  And while the specific circumstances of Baker's case—namely, Baker's young age and the fact that he filed the motion *pro se*—did not necessarily require perfect compliance with the rule, the record shows that Baker did not even substantially comply with the rule.  *Id.* Indeed, the record only shows that he mailed his motion to the prosecutor and the trial court; it does not show that Baker *ever* raised the motion again with the court, the prosecutor, or his attorney.  *See* Doc. 1-15 at 36–39; *see infra* note 20.

Critically, *Cotto* calls the court to weigh the state interest in a procedural rule against the unique circumstances of the case.  *Cotto*, 331 F.3d at 240.  Here, the state's interest in the application of the abandonment rule outweighs Baker's allegations.  He simply has not shown that this is an "exceptional" case in which the application of the rule is "exorbitant."  *Id.*  Indeed, despite the fact that "Baker was a 17-year-old charged

with felony murder, who filed a *pro se* motion for new counsel, indicating that his counsel . . . had failed him," the record shows that Baker's characterization of Bruno's assistance lacked credibility and was otherwise unsupported.  Doc. 29 at 14; *see* Doc. 1-11; *compare* Doc. 1-16 ¶ 19 *with* Doc. 1-16 ¶ 28.; Doc. 1-13 at 3; Doc. 1-15 at 13.  Accordingly, New York's abandonment rule was an adequate basis for denying Baker's claim as to his reassignment motion.  *See Garcia*, 188 F.3d at 77.

In addition to the adequacy of the procedural bar here, Baker has failed to point the Court toward *any* case showing that the Appellate Division "arrive[d] at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at a result opposite to [the Supreme Court's]."  *Taylor*, 529 U.S. at 405; Doc. 17 at 60; *see also* Doc. 2 at 25–30; Doc. 29 at 12–16; Doc. 37 at 5.  None of the cases upon which Baker relies align with the facts of his case.  *See Lewis v. McGinnis*, No. 904 Civ. 32, 2008 WL 833964 (N.D.N.Y. Mar. 27, 2008); *Lopez v. Graham*, No. 10 Civ. 468, 2012 WL 1865502 (E.D.N.Y. 2012); *McKee v. Harris*, 649 F.2d 927 (2d Cir. 1981).  Indeed, neither *Lewis*, *Lopez*, nor *McKee* raise a scenario wherein a criminal defendant mailed a form motion for the reassignment of counsel, failed to raise it before the trial judge or otherwise object in any way to his attorney's representation, continued to participate in his case without pause despite the unresolved motion, and later claimed that he had suffered from a constitutional violation through the trial court's failure to address or adjudicate the motion.  *See generally id.*

For example, *Lewis* deals with a scenario where a defendant's *pro se* motion to substitute counsel was denied without a hearing despite the fact that the defendant claimed that his attorney "would not let [him] testify."  *Lewis*, 2008 WL 833964, at *13–14.  The *Lewis* Court concluded that petitioner's Sixth Amendment rights were *not* violated because there was no indication that the defendant and his attorney were unable to communicate, and counsel had discussed plea offers with his client, filed pre-trial

motions, and prepared for trial. *Id.* at *14. Likewise in this case, besides Baker's self-serving allegations, the record does not indicate that he and Bruno were unable to communicate. And the record shows that Bruno advised Baker about a possible plea and otherwise prepared for and actively participated at trial. *See, e.g.*, Doc. 1-16 ¶ 19; Doc. 1-11 at 6.

*Lopez* similarly fails to support Baker's contention that the Appellate Division arrived at a conclusion contrary to clearly established law as determined by the Supreme Court.[20] *See Taylor*, 529 U.S. at 405. In *Lopez*, the defendant filed a *pro se* motion for reassignment and later alleged that the trial court deprived him of his constitutional right to counsel by failing to give it proper consideration. *Lopez*, 2012 WL 1865502, at *5. The Appellate Division rejected Lopez's claim. *Id.* Reviewing his § 2254 petition, the district court concluded that the Appellate Division's conclusion was not contrary to federal law.[21] *Id.* at *5–6. It determined that the Appellate Division's determination was reasonable despite the fact that the Court was "troubled by the dismissive fashion in which [the trial judge] denied Lopez's motion—especially by her statement that reassignment was 'not going to happen' before she even heard the reasons for it . . . ." *Id.*

---

[20] Baker cites to *Lopez* for the proposition that the Appellate Division's conclusion that he abandoned his motion for new counsel was an unreasonable application of clearly established federal law. Doc. 27 at 2; *see also Lopez*, 2012 WL 1865502, at *7. In dicta, the district court in *Lopez* did state that "to the extent that the state court concluded that it did not need to resolve Lopez's motion prior to trial because Lopez had abandoned it, that determination was an unreasonable application of clearly established federal law." *Id.* However, the Court also pointed out that in that case, "[n]othing in the record suggests that Lopez knowingly abandoned his motion for reassignment, and *the fact that Lopez's defense counsel alerted the court to Lopez's motion during trial* . . . suggests the contrary." *Id.* (citation omitted) (emphasis added). Here, on the other hand, the record shows that Baker never raised the issue of the unresolved motion, despite the various opportunities he was given to provide statements or object to Bruno's affirmations that he and Baker had had the opportunity to discuss various matters. *See supra* pp. 3–6. Importantly, *Lopez* is not a holding of the Supreme Court as of the time of the relevant state-court decision. *Howard v. Walker*, 406 F.3d 114, 122 (2d Cir. 2005).

[21] The *Lopez* Court emphasized that "Lopez's August 2003 request for reassignment consisted primarily of a pre-typed form affidavit with three boxes checked off: that counsel failed to (1) "visit defendant at his place of confinement or have him produced at the Court for a consultation"; (2) "provide copies and inform defendant of any Motions filed, Responses, and Court's decisions thereto"; and (3) "forward me copy of any bill of particulars and or discovery in his/her possession." *Id.* at *8; *compare id.* with Doc. 1-15 at 36–39.

at *9.  Critically, the Court noted that "[e]ven if the trial court had failed to adequately inquire into Lopez's motion, that error would be harmless" because (1) "the grounds for reassignment given by Lopez *at the time* were 'insubstantial'" and (2) the record did not suggest that the alleged problems between Lopez and his counsel "prior to trial persisted during the trial itself or impaired counsel's effectiveness at trial."  *Id.* at 9–10 (quoting *United States v. John Doe No. 1*, 272 F.3d 116, 123 (2d Cir. 2001) (emphasis in original); *see also Baker*, 139 A.D.3d at 591.

McKee also fails to demonstrate that the Appellate Division arrived at a conclusion that was contrary to clearly established federal law in Baker's case.  In that case, the Second Circuit made clear that while courts "should inquire into the reasons for dissatisfaction" where a defendant "voices a 'seemingly substantial complaint about counsel,'" a trial judge's failure to do so may well amount to harmless error.  *McKee*, 649 F.2d at 933 (quoting *United States v. Calabro*, 467 F.2d 973, 986 (2d Cir. 1972).  Here, the record calls into question whether Baker raised a "substantial" complaint about counsel.  Doc. 1-15 at 36–39 (attaching form motion for reassignment of counsel); *see Lopez*, 2012 WL 1865502, at *8.  And while the trial judge's failure to hear Baker's motion on the record may have been in error, the record supports the conclusion that it was harmless.  *See supra* p. 28.

The Court recognizes the importance of the allegations that Baker sets out in his arguments about his unaddressed motion for the reassignment of counsel.  However, for all these reasons, this claim is similarly denied.

### C.  Baker's Claim Regarding the Pre-Trial Protective Order Hearing

Finally, Baker argues that the R & R "errs in its analysis of Mr. Baker's right-to-presence claim" by determining that the Appellate Division did not unreasonably apply clearly established federal law.  Doc. 29 at 17.  He specifically argues that the Report "erroneously concludes" that his presence at the hearing regarding the Government's applications for protective orders would not have been useful.  *See id.* at 17–18.  The

31

Government responds that the Appellate Division's conclusion was not contrary to clearly established law.  Doc. 34 at 7–8.

In regard to this claim, the Appellate Division stated the following:

> The court did not violate defendant's right to be present at a material stage of trial when it excluded him, but not his attorney, from a hearing regarding protective orders delaying certain discovery.  Defendant has not shown that his presence would have been useful, and his various arguments about his ability to contribute are unpersuasive.  In any event, any potential for input from defendant was outweighed by valid concerns for the witnesses' safety, underlying the need for defendant's exclusion (*see People v Frost*, 100 NY2d 129, 135 [2003]).

*Baker*, 139 A.D.3d at 591.

It is well settled that criminal defendants are "guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987).  However, an excluded defendant's due process rights are not denied *ipso facto*. *See id.* at 745–46 ("We conclude that respondent's due process rights were not violated by his exclusion from the competency hearing in this case.  We emphasize, again, the particular nature of the competency hearing.  *No question* regarding the *substantive testimony* that the [witnesses] would have given during trial was asked at that hearing.") (emphasis added).  As the R & R notes, "the constitutional right to presence is 'rooted to a large extent in the Confrontation Clause of the Sixth Amendment,' and thus clearly encompasses situations in which a criminal defendant is confronting witnesses or evidence against him."  Doc. 25 at 31 (quoting *United States v. Gagnon*, 470 U.S. 522, 526 (1985)).  However, "there is no constitutional right to be present 'when presence would be useless, or the benefit but a shadow.'"  *Cohen v. Senkowski*, 290 F.3d 485, 498 (2d. Cir. 2002) (quoting *Snyder v. Commonwealth of Massachusetts*, 291 U.S. 97, 105–06 (1934)).

Here, the Appellate Division's conclusion was not unreasonable under either prong of 28 U.S.C. § 2254(d).  *See Baker*, 139 A.D.3d at 591.  Contrary to Baker's

contentions, the R & R did not "overlook" the fact that "knowledge of a material benefit—such as the Coles' housing benefit in exchange for their testimony" is "useful at trial." Doc. 29 at 18. The R & R clearly acknowledged the importance of that information when it recognized that "Baker was advised of the Coles' housing transfer before they testified and had an opportunity to discuss the issue with his counsel prior to their cross-examination." Doc. 26 at 32; *see also Baker*, 139 A.D.3d at 591 (noting that the court excluded Baker, "*but not his attorney*, from a hearing regarding protective orders") (emphasis added).

Nor has Baker shown how his presence at the hearing "could have led the court to reject the protective order," *or* how that decision was "critical" to the outcome of his case. Doc. 29 at 17; *see Stincer*, 482 U.S. at 745. To be clear, the hearing involved the Government's motion for two protective orders regarding three witnesses, given the safety concerns presented in regard to those witnesses. *See* Doc. 1-20 at 15–26. Critically, Baker learned about the identity of two of those three witnesses, Barbara and Denise Coles, *before* the hearing, and he also heard that the two of them would be receiving a benefit in exchange for their testimony. *Id.* at 15. What he did *not* hear was the exact benefit, which was discussed outside of his presence. *Id.* at 15. As noted above, the court directed all counsel and the court reporter to discuss the protective order requests outside the presence of the defendants. *Id.* at 27–29. During the hearing, the court heard the prosecutor's concerns about the safety of Barbara and Denise Coles, as well as Osvaldo Vargas, the third witness that was not identified in front of Baker. *Id.* at 27–31. However, the prosecutor added Vargas to the witness list, in Baker's presence, the following day. *Id.* at 65.

Baker's contentions that his "personal knowledge could have led the court to reject the protective order," and that his "exclusion [thus] prevented him from offering information to counsel that could have assisted in cross-examination" are both unsupported and meritless. Doc. 29 at 18, 19. He simply does not show how his

purported knowledge of the motive of Barbara and Denise Coles to lie would have had an effect on the judge's decision to grant the protective orders, particularly where the prosecutor provided a lengthy allocution about the threats that the witnesses had received in regard to their anticipated testimony. *Compare id.* at 17 *with* Doc. 1-20 at 27–29. He also fails to show how he was prevented from "offering information that could have assisted in cross-examination" given that he knew about the identity of Barbara and Denise Coles, the prosecution's intention to call them as witnesses, and the fact that they would be receiving a benefit for their testimony *before* the hearing took place. Doc. 1-20 at 15. The same reasoning applies to Vargas given that Baker found out about his identity the day after the hearing. *Id.* at 65.

Baker's arguments about the possible benefits of his presence at the pre-trial hearing are thus unavailing. The hearing did not consider or focus on the substantive testimony that the three witnesses would provide. *Stincer*, 482 U.S. at 745–46. Nor did Baker's exclusion prevent him or his attorney from preparing for trial. Baker and Bruno both knew that Barbara and Denise Coles would be receiving a benefit in regard to their testimony *before* the hearing took place; Bruno learned about Vargas' identity during the hearing; and Baker learned about Vargas' identity shortly thereafter, when the prosecutor stated it on the record the following day before opening arguments, and well before Vargas could testify.[22] *See* Doc. 1-20 at 16–31, 65.

For all these reasons, the Court agrees with Judge Aaron's § 2254(d) analysis regarding Baker's right to be present at the protective order hearing. Doc. 26 at 32. Baker's claim is thus denied.

## IV.   CONCLUSION

For the reasons set forth above, the Court adopts Magistrate Judge Aaron's Report in its entirety and Baker's petition for a writ of *habeas corpus* is DENIED. The Clerk of

---

[22] Vargas ultimately did not testify at Baker's trial. *See generally* Doc. 1-20; Doc. 1-21; Doc. 1-22; *see also* Doc. 26 at 7.

Court is respectfully directed to close this case.  As Baker has not made a substantial

showing of a denial of a constitutional right, a certificate of appealability will not issue.

*See* 28 U.S.C. § 2253(c); *see also, e.g., Matthews v. United States*, 682 F.3d 180, 185 (2d

Cir. 2012).

It is SO ORDERED.

Dated:    December 13, 2022
          New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.